**Melvin Meffery WADE, Petitioner–Appellant,**

v.

**Arthur CALDERON,\* Warden of San Quentin; Attorney General of California, Respondents–Appellees.**

**No. 90–56332.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 16, 1993.

Decided May 16, 1994.

---

\* Arthur Calderon has succeeded Daniel Vasquez as Warden of San Quentin Prison, and is substituted as a party pursuant to Fed.R.App.P. 43(c)(1).

Barry P. Helft, Donald J. Ayoob, Deputy State Public Defenders, San Francisco, CA, Michael R. Levine, Asst. Federal Public Defender, Portland, OR, Joel Levine, Encino, CA, as Special Counsel for petitioner-appellant.

Pat Zaharopoulos, Deputy Atty. Gen., and Holly D. Wilkens, Supervising Deputy Atty. Gen., San Diego, CA, for respondent-appellee.

Cliff Gardner, Fiedler, Gardner & Derham, San Francisco, CA, for amicus California Appellate Project.

Kent S. Scheidegger, Sacramento, CA, for amicus Crim. Justice Legal Foundation.

Before: CANBY, REINHARDT, and TROTT, Circuit Judges.

Partial Concurrences and Partial Dissents by Judges REINHARDT and TROTT.

CANBY, Circuit Judge:

Melvin Meffery Wade, a California state prisoner sentenced to death, appeals the district court's denial of his 28 U.S.C. § 2254 habeas petition. Wade was convicted in the San Bernardino County Superior Court of first-degree murder. We review de novo the district court's denial of the habeas petition. *Norris v. Risley*, 878 F.2d 1178, 1180 (9th Cir.1989). We affirm the district court's denial of relief on the merits of those claims challenging Wade's conviction. We hold, however, that Wade's death sentence cannot stand for two reasons. First, Wade is entitled to a new special circumstances determination because the torture-murder special circumstance instruction failed to meet the requirements of the Eighth Amendment.[1] Second, Wade received ineffective assistance of counsel at the penalty phase of his trial.

Finally, we reject Wade's various challenges to his habeas proceedings in district court.

I

FACTS

The facts of this case are set out at greater length in *People v. Wade*, 44 Cal.3d 975, 244 Cal.Rptr. 905, 750 P.2d 794, *cert. denied*, 488 U.S. 900, 109 S.Ct. 248, 102 L.Ed.2d 237 (1988). Wade was 24 years old at the time of the offense. He was living with his wife, Irabell "Cookie" Strong, and four of Cookie's children, one of whom was Joyce Tolliver, the victim.

On the morning of April 10, 1981, after accusing 10-year-old Joyce of not properly washing herself, Wade began hitting her. He proceeded to beat her with a wooden board. He then ordered her to get inside a duffel bag, and told one of the other children to zip the bag. He then put the bag containing Joyce in the unfinished attic.

Joyce eventually freed herself from the bag and asked if she could come down. As she came down, Wade began beating her again, shouting that he was "Michael the Archangel" and that he would kill Joyce because she was a "devil." Wade continued to beat her throughout the evening, and at one point attempted to hang her from a nail on the wall with a dog leash.

Later, Wade also hit Cookie and then ran away. Cookie asked the manager of the motel where they lived to call the police.[2] When the police arrived, they found Joyce dead on the bedroom floor. A subsequent autopsy revealed that Joyce died from cranial, cerebral, abdominal, and soft-tissue injuries.

Shortly after the police arrived, Wade returned to the motel with his hands in the air and said: "Here I am. I'm the one you want. I guess I hit her too hard. I guess I hit her too hard." Wade was then arrested.

Evidence was admitted at trial that Wade had been physically and sexually abused by Jack, his mother's boyfriend, from the age of three. Jack also would lock Wade in a closet for hours at a time. Wade, while in the closet, would talk to an imaginary friend. Eventually, this friend, called "Othello," began to talk back to him. Wade began experi-

---

1. Because we determine that Wade's death penalty is invalid, we need not address his contention that the California Supreme Court failed to conduct a proper re-weighing or a harmless error analysis after invalidating the "heinous, atrocious, or cruel" special circumstance found by the jury. *See* Cal.Penal Code § 190.2(a)(14).

2. The manager had earlier called the police when he heard a commotion. The police came but left without learning about or finding Joyce.

encing blackouts at the age of 12, and received psychological counseling throughout his childhood. He also attempted suicide three times.

All of the defense medical and psychological experts determined that Wade had an alternate personality called "Othello," although one viewed the phenomenon as being one of Wade's believing that he was possessed by devils. Two of the experts encountered additional personalities named "Michael" and "Joe." While the experts testified that Wade was mild-mannered, "Othello" was hostile, boisterous, and violent. Evidence was also presented that Wade was borderline mentally retarded with an IQ of about 70.

During the penalty phase of his trial, Wade testified that he was unaware he had killed Joyce and that he loved her. He also testified briefly about the abuse he received as a child. At his counsel's request, Wade brought forth "Othello," who testified that he felt no sorrow for Joyce's death and asked that the jury sentence Wade to death.

## II

### PROCEDURAL HISTORY

Wade was convicted of murder and sentenced to death on May 21, 1982. On direct appeal, Wade's death sentence initially was reversed because the trial court had instructed the jury that it must not be swayed by sympathy in determining Wade's punishment. *People v. Wade,* 43 Cal.3d 366, 233 Cal.Rptr. 48, 59, 729 P.2d 239, 250 (1987). On rehearing, however, the California Supreme Court changed its previous stance and affirmed Wade's conviction and sentence. *People v. Wade,* 44 Cal.3d 975, 244 Cal.Rptr. 905, 907, 750 P.2d 794, 796 (1988). Although the Court held that the "heinous, atrocious or cruel" special circumstance found by the jury was unconstitutionally vague, it affirmed Wade's death sentence on the basis of the torture-murder special circumstance. *Id.* 233 Cal.Rptr. at 57–59, 729 P.2d at 248–50. The United States Supreme Court denied certiorari. *Wade v. California,* 488 U.S. 900, 109 S.Ct. 248, 102 L.Ed.2d 237 (1988).

Wade filed a petition for habeas corpus in the district court, pursuant to 28 U.S.C. § 2254. The district court denied the petition after holding an evidentiary hearing on an ineffective assistance of counsel claim. *Wade v. Vasquez,* 752 F.Supp. 931 (C.D.Cal. 1990). On appeal, this court, after appointing special counsel, ordered a limited remand on an issue of alleged conflict of interest of habeas counsel. *Wade v. Vasquez,* No. 90–56332, unpublished memorandum disposition (9th Cir. April 21, 1992). After conducting a two-day hearing, the district court held that there was no conflict of interest and denied the claim. *Wade v. Vasquez,* No. CV 89–0173–R, unpublished memorandum disposition (C.D.Cal. Dec. 14, 1992). This appeal followed.

## III

### GUILT PHASE CONTENTIONS

Wade contends that trial counsel provided ineffective assistance in violation of the Sixth Amendment during several portions of the guilt phase. We reject this contention.

■ In order to demonstrate that his counsel was ineffective, Wade must show that counsel's performance fell below that of a reasonable attorney and that counsel's errors created a reasonable probability that, but for the errors, the outcome of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984). We "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065. Furthermore:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

*Id.* at 690–91, 104 S.Ct. at 2066.

■ Wade's first contention, and the one that is most troubling concerning counsel's guilt phase performance, is that counsel did

not adequately investigate and prepare before the start of trial. Wade further argues that counsel had no theory of the defense at the time the trial commenced. As evidence of his counsel's lack of preparation, Wade points to the fact that his counsel, who took over the case from prior counsel, billed only twelve and one-half hours prior to the start of trial. Moreover, Wade contends that had counsel been prepared, he would have presented a "battered child syndrome" defense as recognized in *People v. Steger*, 16 Cal.3d 539, 128 Cal.Rptr. 161, 167, 546 P.2d 665, 671 (1976).

Trial counsel, however, testified at the evidentiary hearing in the district court that he did not bill anywhere near the actual amount of time spent on the case because, as other testimony also indicated, the county courts were very frugal with funds for appointed counsel in capital cases. This explanation was found as a fact by the district court. Wade has not demonstrated that the finding is clearly erroneous.

Counsel's preparation prior to trial certainly could have been more thorough. At the beginning of the trial, counsel had reports from some experts that Wade's capacity to commit premeditated murder was questionable, but Wade's mental health picture was incomplete. Jury selection began only two months after counsel, Wade's second attorney, was appointed. Counsel could have asked for a continuance until he received the reports from the remaining experts who were examining Wade, but he failed to do so. Counsel did not decide to present a defense of multiple personality disorder until a week after the jury had been sworn in, which is when he began to receive reports from his experts that Wade might suffer from this disorder. However, even if we were to hold that counsel's preparation was below that of a reasonable attorney, we must still address whether, but for counsel's lack of preparation, there is a reasonable probability that the outcome of the proceeding would have been different. *See Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. We conclude that Wade cannot demonstrate prejudice under this standard.

Wade contends that counsel's lack of preparation deprived Wade of effective assistance because, had counsel been properly prepared, he would have presented a defense based on the battered child syndrome. That defense, according to Wade, would have been better than the multiple personality disorder defense presented at trial. Neither the law nor the facts of Wade's case support a conclusion, however, that Wade's counsel fell below the *Strickland* standard in presenting the defense he did.

In *People v. Steger*, upon which Wade relies, the California Supreme Court reversed a conviction of first degree murder by torture where the evidence demonstrated that the defendant severely beat her child but failed to demonstrate that the defendant intended to torture the victim. *Id.*, 128 Cal.Rptr. at 167, 546 P.2d at 671. The court noted that the evidence showed that the beatings were a misguided attempt at discipline; the court rejected the People's argument that the jury could infer an intent to torture because the beating was inflicted over a long period of time. *Id.* In so holding, the court stated:

> The People emphasize that the child's wounds were inflicted over a long period of time. In some cases this fact might lend support to a torture murder conviction. For example, if a defendant had trussed up his victim, proof that pain was inflicted continuously for a lengthy period could well lead to a conclusion that the victim was tortured.

*Id.* The court held that the jury may consider all the circumstances surrounding the killing, including the severity of the victim's wounds, as one factor in determining whether the defendant intended to torture the victim. *Id.* 128 Cal.Rptr. at 165, 546 P.2d at 669. The court only briefly discussed the defense of battered child syndrome, stating that a person suffering from the syndrome exhibits *uncontrollable* displays of physical abuse against the child. *Id.* 128 Cal.Rptr. at 167 n. 4, 546 P.2d at 671 n. 4. The court noted that the defendant, like someone suffering from battered child syndrome, displayed uncontrolled outbursts in beating the victim, emphasizing the fact that there was nothing deliberate about the beating. *Id.*

The facts surrounding Wade's offense are significantly different from those in *Steger*. Evidence was presented that Wade locked the victim up in a duffle bag, attempted to hang her, and beat her over a 22–hour period, frequently with boards. The evidence presented in *Steger* merely suggested that the defendant had hit the victim on prior occasions. While Wade had done so as well, Wade's conduct on the night of the crime was different from any punishment he had inflicted previously upon the children.

Counsel's defense was centered on the fact that Wade's conduct was aberrational. Counsel presented to the jury evidence that Wade suffers from multiple personality disorder, and that because of this disorder, Wade killed the victim. Wade's statements that he was "Michael the Archangel" and that he was beating the victim because she was the devil supported the defense that Wade was suffering from this disorder on the night of the offense. There is no reason to conclude that the jury would have been more favorably impressed by the defense that Wade did not have the capacity to form the intent to kill or torture the victim simply because he had been beaten as a child and was disciplining the victim in the same way that he had been punished. The facts of the case lend more support to the position that Wade did not form the requisite intent because he suffered from multiple personality disorder. Therefore, Wade cannot demonstrate prejudice from counsel's failure to present a defense of battered child syndrome. *See Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

■ Wade's next contention is that counsel was ineffective in calling Dr. Allison, a mental health expert, to the stand. Allison testified, contrary to other defense experts, that Wade did not suffer from multiple personality disorder. Because of this testimony, Wade maintains that counsel was ineffective in having Allison testify.

Although Allison disagreed with other defense experts concerning the multiple personality diagnosis, his testimony was favorable to Wade. Allison testified that misdiagnosis of multiple personality is common, and that he too had misdiagnosed Wade as having multiple personality disorder. Allison went on to testify that Wade suffered from a dissociative disorder and that he believed that Wade was not faking or malingering. At the conclusion of his testimony, Allison stated that in his opinion, Wade did not intend to kill the victim and was legally insane at the time of the offense. He determined that Wade's dissociative disorder was an unconscious belief by Wade that he was possessed by demons. Allison testified that he did not personally believe in demons, but that Wade's unconscious belief amounted to an atypical dissociative disorder which rendered him legally insane at the time of the offense. In light of this testimony, Wade cannot demonstrate that counsel's decision to use Allison's testimony was sufficiently prejudicial to constitute ineffective assistance. *See Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

■ Wade also contends that counsel, due to his lack of preparation, failed to examine the jurors adequately on voir dire concerning diminished capacity and insanity defenses. It is true that counsel did not question the jury on these defenses at voir dire, although he attempted to do so when he called for a mistrial upon receiving reports that Wade suffered from multiple personality disorder. Again, although counsel's preparation prior to voir dire could have been more thorough, we cannot say that, under all of the circumstances of this case, any prejudice involved was sufficient to warrant reversal.

■ Wade further contends that counsel was ineffective at the guilt phase because he did not present corroborating witnesses to support Wade's multiple personality defense, his abuse as a child, his low IQ, and his use of PCP. Evidence of Wade's IQ, however, was presented to the jury through his school records as well as through expert testimony. There was abundant testimony by experts concerning Wade's multiple personality. The experts also related Wade's abuse as a child; we cannot say that Wade's counsel fell below the *Strickland* standard in failing to buttress that testimony with that of other witnesses. Finally, although evidence of Wade's PCP use was alluded to, counsel purposely did not

rely on this use as a defense because he felt that the jury would only use such evidence in aggravation. Moreover, there was no evidence that Wade ingested PCP on the day of the offense. This decision of counsel does not amount to ineffective assistance. *See Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066.

■ Finally, Wade contends that counsel's closing argument at the guilt phase amounted to ineffective assistance because counsel distanced himself from Wade. It is true, as Wade notes, that counsel stated that he accepted the case as an appointment and said to his wife that he was not defending Wade but representing him. Counsel also stated that he thought the crime was horrible and that his own wife sent the victim's parents money to put flowers on the victim's grave. If this were all that counsel had stated, then Wade's contention would have merit. Counsel went on, however, to discuss the evidence supporting Wade's diagnosis of multiple personality disorder. He said that Wade not only convinced numerous doctors that he had multiple personalities, but also convinced his own lawyer. Counsel's tactic was to demonstrate that despite the horrible nature of the crime and his own personal feelings, the jury should not precipitate another tragedy by convicting Wade of first degree murder when he had lacked the intent to kill. This tactic does not amount to ineffective assistance. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066.

To conclude, even considering the cumulative effect of Wade's contentions concerning counsel's performance, *see Ewing v. Williams,* 596 F.2d 391, 395 (9th Cir.1979), we hold that counsel's performance at the guilt phase did not deprive Wade of a fair trial. Accordingly, we affirm the district court's judgment with respect to this claim.

## IV

### SANITY PHASE CONTENTIONS

■ Wade contends that counsel was ineffective at the sanity phase because he waived additional argument and asked the jury to rely on the guilt phase evidence. Counsel, however, presented at the guilt phase the testimony of two experts that Wade was legally insane in order to support his defense that Wade had a diminished capacity due to his multiple personality disorder. Counsel was not ineffective in failing to repeat the same evidence that the jury already had considered and rejected at the guilt phase. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

## V

### SPECIAL CIRCUMSTANCES CONTENTIONS

Wade contends that the jury instructions regarding the torture-murder special circumstance, Cal.Penal Code § 190.2(a)(18), failed to narrow the class of capital crimes sufficiently to meet the requirements of the Eighth Amendment. We agree.

■ The Eighth Amendment requires that a jury's discretion be sufficiently channeled to allow for a principled distinction between the subset of murders for which the sentence of death may be imposed and the majority of murders which are not subject to the death penalty. *Zant v. Stephens,* 462 U.S. 862, 876–77, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983); *Godfrey v. Georgia,* 446 U.S. 420, 428–29, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1980). In deciding whether an aggravating factor violates the Eighth Amendment, a federal court must first determine whether the statutory language defining the factor is itself too vague to provide any guidance to the sentencer. *Walton v. Arizona,* 497 U.S. 639, 654, 110 S.Ct. 3047, 3057–58, 111 L.Ed.2d 511 (1990). If so, the next step is to determine whether the state courts have construed the vague terms of the statute to provide some guidance to the sentencer. *Id.*

■ The special circumstance at issue subjects a defendant to the possibility of a death sentence if the jury finds that

[t]he murder was intentional and involved the infliction of torture. For the purpose of this section torture requires proof of the infliction of extreme physical pain no matter how long its duration.

Cal.Penal Code § 190.2(a)(18) (West 1988). On its face, this special circumstance does

not require the jury to find an intent to torture. In that respect, the statute differs from its predecessor, which specified that "torture requires proof of an intent to inflict extreme and prolonged pain." Cal.Penal Code § 190.2(c)(4) (Deering 1977) (repealed 1978).

The California Supreme Court has recognized the deficiency of the current version of the special circumstance, and has held that section 190.2(a)(18) must be interpreted to require that the jury be instructed that the defendant must have intended to cause extreme pain to the victim. *People v. Davenport*, 41 Cal.3d 247, 221 Cal.Rptr. 794, 808–09, 710 P.2d 861, 875–76 (1985). In so ruling, the court stated:

> This court has observed on numerous occasions that in most murders, presumably severe pain precedes the death of the victim. Thus, a special circumstance which requires only an intentional killing in which the victim suffered extreme pain would be capable of application to virtually any intentional, first degree murder with the possible exception of those occasions on which the victim's death was instantaneous. Such a distinction may have nothing to do with the mental state or culpability of the defendant and would not seem to provide a principled basis for distinguishing capital murder from any other murder.

*Id.* 221 Cal.Rptr. at 804, 710 P.2d at 871 (citations omitted). With this reasoning we agree. Without the saving construction placed on it by the California Supreme Court, the torture special circumstance would fail to provide a principled basis for distinguishing capital murder from any other murder. Accordingly, it would fail to meet the Eighth Amendment standard prescribed by *Zant*, 462 U.S. at 876–77, 103 S.Ct. at 2742, and *Godfrey*, 446 U.S. at 428–29, 100 S.Ct. at 1764–65. To avoid this constitutional problem, the jury must be instructed that an intent to inflict extreme pain is an element of the special circumstance. "When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is uncon-

stitutionally vague on its face." *Walton*, 497 U.S. at 653, 110 S.Ct. at 3057.

 The torture special circumstance instruction in Wade's case was clearly deficient under these principles; the jury was not told that it must find that Wade intended to inflict extreme pain. Despite the shortcomings in the instruction, the California Supreme Court affirmed the sentence. In so doing, it rejected Wade's Eighth Amendment challenge on the following grounds:

> Although the special circumstance instruction, viewed in isolation, did not, by its express terms, explain that the "infliction of torture" element of the special circumstance included an intent-to-inflict-cruel-pain requirement, we believe that in light of the accompanying torture-murder instruction and the argument of counsel on this point there is no reasonable likelihood that the jury was misled on this issue.

*Wade*, 244 Cal.Rptr. at 916, 750 P.2d at 805.

We do not agree that the constitutionally deficient special circumstance instruction is cured by a spillover effect from the instructions regarding guilt. Unlike the California Supreme Court and the dissenting opinion herein, we cannot assume that the jury would carry the definition of torture over from the guilt instruction and apply it in its deliberations on the torture-murder special circumstance. The jury was instructed that, if it found Wade guilty of murder in the first degree, it "must *then* determine if the murder was committed under one or both of the ... special circumstances." (Emphasis added.) The jury was then instructed on exactly which facts it must find in order ultimately to find the torture-murder special circumstance, and intent to inflict extreme pain was not among them. The judge stated that he was going to give the jury the printed instructions to follow in its deliberations, and we see no basis for concluding that the jury deviated from the step-by-step directions set forth in those instructions.

In holding that the jury had been adequately instructed, the California Supreme Court determined only that there was no "reasonable likelihood" that the jury was misled by the faulty instruction. While this is the proper standard for determining the

effect of an *ambiguous* jury instruction, *see Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1197–98, 108 L.Ed.2d 316 (1990), the instruction at issue here was not ambiguous. The jury was clearly instructed that:

> To find that the special circumstance, referred to in these instructions as murder involving infliction of torture, is true, each of the following facts must be proved:
>
> 1. That the murder was intentional; and
>
> 2. That the murder involved the infliction of torture.
>
> To prove the infliction of torture, the infliction of extreme physical pain must be proved no matter how long its duration.

There is no ambiguity in these instructions. They clearly and conspicuously require the jury to find intent to murder, and equally clearly and conspicuously *do not* require the jury to find intent to inflict extreme physical pain.[3]

■■■ *Boyde* does not sanction use of the "reasonable likelihood" standard when the disputed instruction is erroneous on its face. Where a jury instruction omits a necessary element of a special circumstance, constitutional error has occurred. *See Walton,* 497 U.S. at 653, 110 S.Ct. at 3057. We are not free to assume that the jurors inferred the missing element from their general experience or from other instructions, for the law presumes that jurors carefully follow the instructions given to them. The Supreme Court has repeatedly stated that it "presumes that jurors, conscious of the gravity of their task, attend closely to the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Francis v. Franklin,* 471 U.S. 307,

324 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985). *See also Richardson v. Marsh,* 481 U.S. 200, 206, 107 S.Ct. 1702, 1706–07, 95 L.Ed.2d 176 (1987) (referring to "the almost invariable assumption of the law that jurors follow their instructions"); *Parker v. Randolph,* 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979) (opinion of Rehnquist, J.) ("A crucial assumption underlying [the] system [of trial by jury] is that juries will follow the instructions given them by the trial judge. Were this not so, it would be pointless for a trial court to instruct a jury, and even more pointless for an appellate court to reverse a criminal conviction because the jury was improperly instructed.")

If the other instructions and what the dissent refers to as "the ordinary meaning of the word 'torture'" are not sufficient to cure the defect in the special circumstance instruction, then the prosecutor's closing argument surely cannot do so. In general, a prosecutor's argument carries less weight than a jury instruction because:

> The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law.

*Boyde v. California,* 494 U.S. 370, 384, 110 S.Ct. 1190, 1206, 108 L.Ed.2d 316 (1990) (citation omitted). Moreover, neither the prosecutor nor Wade's counsel ever informed the jury that it must find that Wade intended to torture the victim before finding the torture-murder special circumstance. The portion of the prosecutor's closing argument that the California Supreme Court relies on does not suggest to the jury that the torture-murder special circumstance requires a finding of intent to torture.[4] We conclude that the

---

**3.** We cannot accept the view that the jury must have understood the common meaning of "torture" to include an element of intent. The jury was not left to apply an unstated common meaning of "torture." Torture was defined for the jury in terms that *did not include the constitutionally-necessary element of intent to inflict extreme pain.*

**4.** The prosecutor's argument quoted by the California Supreme Court is as follows: "When we go to the special circumstance, you see that

again there's a torture special circumstance, and basically torture in the special circumstance relates to the same thing as the first degree murder theory with one exception: There is an additional requirement, and it's very important. Under the torture special circumstance, again, there's a requirement that there was an infliction of cruel pain and suffering, that it was done over a period of time, but again there's no requirement that there be proof as to the duration. It doesn't have to be for six hours or four hours or three or two.

instructions to the jury regarding the circumstances under which it could find Wade eligible for death violated the Eighth Amendment in failing adequately to guide the jury's discretion.

■ If a factor used to determine whether a defendant is eligible for the death penalty fails to narrow adequately the class of capital crimes, a reviewing court may affirm the death sentence only by finding that consideration of the improper aggravating factor was harmless or by reweighing the evidence without considering the factor. *Sochor v. Florida,* — U.S. —, — – —, 112 S.Ct. 2114, 2122–23, 119 L.Ed.2d 326 (1992). The error in this case was not harmless, because it necessarily had a "substantial and injurious effect or influence in determining the jury's verdict" in imposing a sentence of death. *Brecht v. Abrahamson,* — U.S. —, —, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). In determining whether an error is harmless, "the question is *not* 'were they [the jurors] right in their judgment, regardless of the error or its effect on the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision.'" *Brecht,* — U.S. at —, 113 S.Ct. at 1724 (Stevens, J., concurring) (quoting *Kotteakos v. United States,* 328 U.S. 750, 764, 66 S.Ct. 1239, 1247–48, 90 L.Ed. 1557 (1946)); *see also Sullivan v. Louisiana,* — U.S. —, —, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993) ("The inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error"). Here, the effect of the error was to permit the jury to find Wade eligible for the death penalty without having to make any finding of his intent to torture.[5] The error thus influenced the jury's verdict.[6]

Moreover, we cannot conclude that, in light of the other instructions, the jury necessarily found that Wade had an intent to inflict extreme pain. It is true that the instruction regarding the crime of murder by torture included an intent requirement. But the jury was also instructed on an alternate theory of first-degree murder—that of regular premeditated murder. There is no way to determine on which theory the jury convicted. Consequently, it cannot be said that, in convicting Wade, the jury necessarily found that he had intended to torture the victim.

We cannot, therefore, uphold the torture-murder special circumstance on a harmless error theory. The alternative means of upholding a death sentence based on an invalid eligibility factor—a reweighing by the state court of the evidence without regard to the invalid factor—is not open because the only other special circumstance found by the jury, "heinous, atrocious or cruel" murder, was invalidated by the California Supreme Court. Without a valid special circumstance finding, Wade is ineligible for the death penalty. *See* Cal.Penal Code § 190.2 (West 1988). Therefore, the writ must issue vacating Wade's death sentence, and no new sentence of

Any period of time wherein there was infliction of cruel pain and suffering satisfies the torture. There's no requirement again that there be any showing of the victim's awareness of pain. That's not required. But there is a requirement that is non-existent in the first-degree murder theory and that is a requirement of intent to kill. That's required under the special circumstance of torture, intent to kill." *Wade,* 244 Cal.Rptr. at 916 n. 14, 750 P.2d at 805 n. 14.

**5.** The error in jury instructions was the equivalent of applying an unconstitutionally vague standard that had never been narrowed, a practice that invalidated a death sentence on habeas review in *Maynard v. Cartwright,* 486 U.S. 356, 363–64, 108 S.Ct. 1853, 1858–59, 100 L.Ed.2d 372 (1988). "When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process.

It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face." *Walton,* 497 U.S. at 653, 110 S.Ct. at 3057.

**6.** This is not a case like *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), in which the jury is improperly instructed that it can presume an element of a crime (intent) if it finds certain other facts. In some such cases, a reviewing court may be able to conclude from the record that the presumption played no part in the verdict because no rational jury could have found the predicate facts and also not have found the ultimate fact. *See Sullivan,* — U.S. at —, 113 S.Ct. at 2082. Here, the jury was not required to find facts from which any rational juror would have had to find an intent to inflict extreme pain.

death may be imposed without a new determination of special circumstances.[7]

## VI

## PENALTY PHASE CONTENTIONS

■ Wade contends that counsel was ineffective in failing to prepare adequately for and to present evidence in the penalty phase.[8] Wade asserts that counsel was ineffective in failing to call his sister, Sharon Wade Curtis, and his mother, Shirley Gross, as witnesses to testify about his abuse as a child. Wade makes the same argument regarding forensic experts. He also argues that counsel's stated reason for not presenting evidence of child abuse—that it was already before the jury at the guilt phase—is not persuasive because the jury during the guilt phase was told to consider that evidence only as the basis of the medical opinion and not for its truth. Finally, Wade contends that counsel was ineffective in his closing argument, and that his ineffectiveness was further exacerbated by his summoning of "Othello," who challenged the jury to sentence Wade to death.

To demonstrate that his counsel was ineffective, Wade must show that counsel's performance fell below that of a reasonable attorney and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. We conclude that Wade has shown that his counsel "made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* In so ruling, we consider the cumulative effect of counsel's errors. *See Ewing,* 596 F.2d at 396.

Trial counsel cited tactical reasons for not presenting corroborating evidence of Wade's child abuse at the guilt phase. Counsel suggests that Wade's mother and sister would not have been particularly helpful witnesses,

and counsel can be given the benefit of the doubt on that issue for purposes of the penalty phase. It is difficult to find a tactical reason, however, for not presenting *any* significant evidence of abuse at the penalty phase. The State contends that Wade cannot demonstrate prejudice because the evidence was presented at the guilt phase. The problem with this argument, as Wade notes, is that the jury was instructed that it could not consider such evidence for its truth. Although, at the penalty phase, the jury was instructed to consider evidence presented during all phases of the trial, the restriction on use of the evidence of child abuse was not removed.

The only significant evidence of mitigation provided at the penalty phase, then, was Wade's own brief affirmative answer to counsel's question whether Wade had told the truth to his doctors about having been abused by his mother's boyfriend, Jack. The dissenting opinion here argues that this question and answer reflects a clever tactic to render all of the earlier limited-use abuse testimony admissible for its truth. But that point was never made to the jury. All that the jury had before it on abuse, to consider for its truth, was Wade's brief, unadorned answer. Counsel made no point at all about child abuse in the penalty phase. This "tactic" is inexplicable.

Wade also contends that counsel was ineffective when he made the choice to call forth "Othello." Perhaps it can be argued that it was a reasonable tactic to let the jury, despite the fact that it had already rejected a multiple personality defense in the guilt phase, hear from "Othello," but the substance of Othello's testimony can only have been damaging to Wade. Othello was profane, insulting, and effectively challenged the jury to execute Wade, because Othello wanted to kill him anyway. Some of counsel's questions seemed destined to produce adverse results:

---

7. Remanding the case for a new special circumstance trial is the proper procedure in California when the jury considers invalid special circumstances. *See People v. Roy,* 207 Cal.App.3d 642, 255 Cal.Rptr. 214, 223 (1989).

8. Although the improper torture-murder special circumstance instruction is sufficient to invalidate Wade's death sentence, we deem it appropriate to address Wade's claim of ineffective assistance of counsel as well, for it presents an additional compelling reason why his death penalty cannot stand.

Q. ... You killed Joyce Tolliver, didn't you?

A. So what, man?

Q. Does that mean yes?

A. Wasn't just me.

. . . .

Q. So Joyce died?

A. You can say it like that, yeah.

Q. At your hands?

A. Not just the part on mines.

RT 6329. And again:

Q. ... Let's assume that you don't have the power you think you have and that you can't kill Melvin on December 8th or at any other time. Okay? And let's also assume that this jury sentences that body to die in the gas chamber. Okay? Would you have the guts to allow Melvin to black out and you be the one to be gased? Would you have those guts?

A. How are you gonna gas something that don't exist? You know what I mean?

Q. You mean you're a spirit and don't exist? Is that what you are talking about?

A. What do you think?

RT 6336. In apologizing to the jury for the coarseness of Othello's testimony, counsel stated: "I didn't know what the testimony would be." RT 6468. That certainly seems to have been the case, and that fact and the results it produced do not speak well for the decision of counsel to propound those questions. With Othello's repellent testimony, and a virtually total absence of evidence of his abuse as a child, Wade was left with no mitigating evidence at all.

If any doubt remains that counsel was ineffective at the penalty phase, it is erased by counsel's closing argument, which is reproduced in full as an appendix to Judge Reinhardt's concurring opinion. He began his closing argument by asking the jury to spare Wade's life, if for no other reason than

to let doctors examine him as a "human guinea pig." Counsel conceded that he thought the jury had already made up its mind to sentence Wade to death by stating: "I believe the die has already been cast. I think that you as individuals without consulting each other collectively based upon your past verdicts in this case have decided what to do." At the conclusion of the argument, counsel gave up any effort to persuade the jury to impose a sentence other than death by stating:

> I just want to conclude with, considering the disorder, the emotional disturbance that the evidence has suggested to you by way of the physicians in this case and the psychologists, I don't think that Melvin Wade, Melvin Meffery Wade, can actually, can be said to lose this case. As has been expressed to me by Melvin on many occasions, he can't live with that beast from within any longer and if in your wisdom you think the appropriate punishment is death, you may be also giving an escape once again by analogy the gift of life to Melvin Meffery Wade to be free from this horror that he and only he knows so well.

There is simply no tactical reason to argue to the jury that executing Wade would be an outcome favorable to Wade. In a similar context, the Supreme Court has held that a prosecutor's argument which diminishes the seriousness of the jury's penalty determination is extremely prejudicial. *See Caldwell v. Mississippi*, 472 U.S. 320, 332–33, 105 S.Ct. 2633, 2641–42, 86 L.Ed.2d 231 (1985). Counsel's closing argument effectively relieved the jury of any doubt or anguish it might feel in sentencing Wade to death. By arguing to the jury that executing Wade would benefit Wade by freeing him of his mental illness, counsel's argument resulted in the "breakdown in the adversarial process that our system counts on to produce just results." [9] *Strickland*, 466 U.S. at 696, 104 S.Ct. at 2069.

---

9. The dissent argues forcefully that we should take care in characterizing counsel as ineffective, lest we add to the difficulty of securing counsel to defend unpopular capital cases. We agree. We are, however, dealing with a case in which counsel went to trial two months after taking the case, and before expert reports had been rendered to enable him to determine the nature of

his mental defense. He then ended the trial by telling the jury that if it chose to execute his client, it may be giving that client "the gift of life." Three justices or former justices of the California Supreme Court concluded that trial counsel's performance, either in the guilt or penalty phases, was ineffective. *People v. Wade*, 233 Cal.Rptr. at 59–67, 729 P.2d at 251–58 (dissent-

Assessing the cumulative effect of counsel's errors, we conclude that counsel's performance was seriously deficient, and that there is a reasonable probability that, absent these errors, the result of the proceeding would have been different. Although several of counsel's individual decisions, taken in isolation, might arguably have been justified, there can be no justification for his overall performance when those actions are viewed in context. Counsel's presentation at the penalty phase focused exclusively on Wade's multiple personality, despite the fact that the jury had twice rejected the multiple personality defense. Although counsel briefly asked Wade whether he had told the psychiatrists the truth about the abuse he experienced as a child, he did not remind the jury of the facts regarding this abuse, and in his closing argument, counsel utterly failed to mention the history of abuse.

In sum, Wade's counsel abandoned a potentially forceful mitigating circumstance in favor of exclusive reliance on a theory which the jury had rejected twice before, and which was presented in a manner that clearly risked alienating the jury. In combination with the indefensible closing argument, these errors dictate the conclusion that counsel's performance was constitutionally deficient. Had Wade received a competent defense, a reasonable probability exists that the jury would have returned a sentence of life imprisonment without the possibility of parole. *Id.* at 687, 104 S.Ct. at 2064.

Therefore, Wade has demonstrated that counsel was ineffective in his representation at the penalty phase, and because of his ineffectiveness, Wade was denied a fair and reliable penalty trial. *See Lockhart v. Fretwell,* —— U.S. ——, ——, 113 S.Ct. 838, 842, 122 L.Ed.2d 180 (1993) (reaffirming that petitioner must demonstrate unreliable and unfair trial in order to succeed on claim of

ineffective assistance of counsel). His death penalty therefore cannot stand.[10]

## VII

## DISTRICT COURT HEARING

Wade contends that the district court denied him various rights in the course of his habeas hearing. Because we are affirming the portion of the district court's decision upholding the determination of Wade's guilt, we address these contentions.

### 1. Denial of right to attend hearing

 Wade first contends that the district court violated 28 U.S.C. §§ 2243 and 2254 by denying him the right to be present at his habeas hearing. Wade asserts that, because the district court ordered an evidentiary hearing on factual matters in which Wade participated, he had a right to be present. Wade relies on the provision of section 2243 requiring the respondent to produce the body of the person detained. *See Walker v. Johnston,* 312 U.S. 275, 285, 61 S.Ct. 574, 578–79, 85 L.Ed. 830 (1941).

The Supreme Court has made it clear, however, that a petitioner does not have an automatic right to be present at a hearing in which he is collaterally attacking his criminal conviction. *See Machibroda v. United States,* 368 U.S. 487, 495, 82 S.Ct. 510, 514, 7 L.Ed.2d 473 (1962); *Sanders v. United States,* 373 U.S. 1, 20, 83 S.Ct. 1068, 1079–80, 10 L.Ed.2d 148 (1963); *see also Christy v. United States,* 437 F.2d 54, 55 (9th Cir.1971). Wade argues that these statements are inapplicable because they were made in connection with collateral attacks on federal criminal convictions under 28 U.S.C. § 2255, which expressly permits hearings in the absence of the petitioner, while section 2254 does not. We do not agree, however, that

---

ing opinion of Bird, C.J., joined by Broussard and Reynoso, JJ.); *People v. Wade,* 244 Cal.Rptr. at 920–21, 750 P.2d at 809 (dissenting opinion of Broussard, J.). This is not the case in which to characterize a finding of ineffectiveness as only adding "a new character to this tragic tale."

**10.** In light of our disposition, we need not address Wade's claims that the mitigation instructions deprived him of a fair penalty hearing.

Wade does not argue that the instructions are unconstitutional on their face, *see Blystone v. Pennsylvania,* 494 U.S. 299, 307–08, 110 S.Ct. 1078, 1083–84, 108 L.Ed.2d 255 (1990); *Boyde v. California,* 494 U.S. 370, 377, 382, 110 S.Ct. 1190, 1196, 1199, 108 L.Ed.2d 316 (1990), but contends that in the context of his trial and his counsel's inadequate presentation of mitigation evidence, the instructions misled the jury.

the district court is required to order the production of a state prisoner under circumstances when it would not be required to order the production of a federal prisoner. On this question, the requirements of sections 2254 and 2255 are the same. *See Moorhead v. United States,* 456 F.2d 992, 996 (3d Cir.1972) (citing *United States v. Hayman,* 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232 (1952)). The question, then, is whether the district court abused its discretion in declining to order Wade to be brought to the hearing. *See Barnes v. United States,* 579 F.2d 364, 365 (6th Cir.1978).

We cannot say that the district court abused its discretion in this case. The issues at the evidentiary hearing were whether counsel had rendered ineffective assistance, and whether jurors had received improper communications. Wade was not expected to testify on either subject. Indeed, immediately prior to the scheduled evidentiary hearing, habeas counsel moved for relief on the ground that Wade was incompetent to assist in his case. Prior to the rescheduled evidentiary hearing, habeas counsel stated that Wade would not be able to recollect the facts of the crime. The district court denied the request for Wade's presence, but told Wade's habeas counsel that if any issues came up requiring him to confer with Wade, the court would give him that opportunity. Counsel was told that if Wade had evidence to give, then a showing to that effect should be made and Wade could be brought in. No such showing was made. On this record, we find no abuse of discretion.[11]

### 2. Scope of the hearing.

▇▇ Wade contends that the district court impermissibly limited the scope of the hearing on ineffective assistance to the question whether Wade's trial counsel had failed to prepare adequately. Wade contends that

this limitation prevented him from showing the full extent of trial counsel's ineffective assistance during the course of the trial. Wade also contends that the district court, after impermissibly limiting the scope of the hearing, permitted the State to introduce evidence supporting the adequacy of trial counsel's representation during trial.

Although the district court did state at one point that the issue for evidentiary hearing was the inadequate preparation of counsel for trial, we agree with the State that Wade and his habeas counsel could not reasonably have considered the issue to be so narrowly limited. Habeas counsel had emphasized inadequate preparation of trial counsel, primarily because trial counsel had billed only 12.5 hours prior to trial, but the thrust of their argument was necessarily directed toward counsel's trial performance. As the State points out, there is no constitutional right to a particular degree of preparation for trial; faulty preparation is meaningful only to the extent that it results in ineffective assistance of counsel at critical stages of the criminal proceeding. The district court elsewhere at the beginning of the hearing characterized the issue as being that of "how Mr. Ames handled the trial." Wade's habeas counsel could not have been misled.

Indeed, the State's evidence of which Wade complains—the testimony of the judge who presided at Wade's trial—was presented out of order before Wade put on his evidence. The judge's testimony, to the effect that Ames had performed competently at the trial, made clear that trial performance was in issue.

We also find no merit in Wade's contention that the district court improperly limited his expert evidence regarding the battered child syndrome and evidence of PCP use. Sufficient evidence regarding the basics of the

---

11. We also find no abuse of discretion in the district court's denial of habeas counsel's request for a hearing to determine whether Wade was competent to understand and assist in his habeas proceedings. It is not clear for what purpose the competency hearing was requested; Wade was pursuing his habeas petition and had waived no rights. *Cf. Rees v. Peyton,* 384 U.S. 312, 313–14, 86 S.Ct. 1505, 1506–07, 16 L.Ed.2d 583 (1966) (directing competency hearing for petitioner who

was attempting to withdraw petition). The statute invoked by counsel, 18 U.S.C. § 4241(a), applies to competency during a criminal trial, as counsel concedes. In any event, the motion here was made on the day prior to the rescheduled evidentiary hearing, on the basis of declarations dated months previously. The district court could properly conclude that the motion was a last-minute delaying tactic.

battered child syndrome were introduced; the limitations enforced by the district court were reasonably designed to restrict the issue to competence of counsel, on the basis of what was reasonably known by counsel at the time of trial. As for the use of PCP, there was no showing that Wade was using PCP at the time of the offense; there was a sufficient basis for decision as to whether trial counsel had properly rejected that defense.

### 3. Conflict of habeas counsel.

■ Wade contends that his counsel at the habeas hearing had a conflict of interest that invalidated the collateral proceedings; he would have us order the district court to begin anew with different counsel. When Wade raised this issue in a prior appeal, we appointed special counsel to pursue this point, and special counsel have presented Wade's claim to the district court on remand, and have briefed and argued the issue here. There is a paucity of precedent in this area, probably for the reason the State suggests: there is no constitutional right to the assistance of counsel in federal habeas proceedings. *Coleman v. Thompson,* 501 U.S. 722, 752–53, 111 S.Ct. 2546, 2566, 115 L.Ed.2d 640 (1991). We need not decide, however, the effect of that fact on the question of conflict; we assume for purposes of decision that an actual conflict of interest on the part of habeas counsel would give rise to some form of relief. We conclude that on this record, no such conflict has been shown.

■ The claim of conflict arose from the fact that Barry Helft, a deputy public defender who was to be lead counsel in Wade's habeas proceeding, had been married until some 13 years earlier to the daughter of Wade's trial counsel. Wade contends that this relationship inhibited Helft, as well as others in his office, from actively pursuing an investigation of trial counsel, with a view toward determining the true reasons that lay behind his trial tactics.

Although this relationship was known to Wade's habeas counsel and their supervisor during the five months prior to the first habeas hearing that Helft worked on the case, the issue was not raised by either counsel until the eve of the hearing. When the relationship was disclosed to the district court, the court declined to disqualify the Public Defender's office, but did remove Helft, leaving deputy public defender Ayoob to conduct the proceedings for Wade. Helft was permitted to remain at the counsel table to assist Ayoob if desired.

After a further evidentiary hearing on remand, the district court concluded that the showing of conflict was utterly insubstantial. It is hard to argue with that conclusion. The evidence indicated that Helft had had very little contact with his former wife during the past 12 years, and had had virtually no relationship and almost no contact with Wade's trial counsel even during the marriage. In law, he certainly had no duty to Wade's trial counsel that conflicted with his duty to Wade. In fact, the district court found that there was no actual inhibition of the vigorous pursuit of Wade's collateral action due to the previous relationship between Helft and Wade's trial counsel. Nor was there any reason why the entire office of the Public Defender, with numbers of attorneys who handled death penalty cases, was inhibited from investigating the case, or from providing a replacement for Helft as habeas counsel. The district court's findings are supported both by the testimony of habeas counsel and their supervisor, and by the court's credibility determinations; the findings are not clearly erroneous.

Finally, the allegations that special counsel insists that habeas counsel should have pursued, concerning practices and attitudes of trial counsel decades before Wade's criminal trial, bear an extremely tenuous relationship to the issue of effective assistance of counsel at Wade's trial. The district court could properly conclude that Wade's habeas action could not have been prejudiced by the alleged failure to investigate these matters further. We conclude that the district court did not err in rejecting the claim of conflict.

## VIII

## CONCLUSION

The district court's denial of habeas relief on Wade's claim of ineffective assistance of

counsel at the guilt phase is AFFIRMED. The district court's denial of Wade's claims relating to the special circumstance finding and penalty phase are REVERSED and the case is REMANDED to the district court with instructions to issue the writ invalidating Wade's death sentence as now imposed. In light of our disposition, we do not reach the remainder of Wade's contentions.

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**

REINHARDT, Circuit Judge, concurring in part and dissenting in part:

I agree that the special circumstances instructions were constitutionally deficient, and that Wade's counsel, S. Donald Ames, rendered ineffective assistance at the penalty phase. Accordingly, I concur in Parts I, II, V, and VI of Judge Canby's opinion. However, I find the conclusion inescapable that Ames's assistance at the guilt and sanity phases also fell far below the constitutional standard, and that, as a result, one's confidence in the outcome of these proceedings is necessarily undermined as well. Therefore, I dissent from Parts III and IV of Judge Canby's opinion.[1]

**I.**

Whether or not Ames spent only twelve and a half hours on this case prior to trial, as his billings reflect, the record makes it abundantly clear that his pre-trial investigation and trial preparation were sorely deficient. Ames took over this case from prior counsel on December 29, 1981. Jury selection was set to begin on February 1, 1982. Yet Ames did not seek a continuance to prepare, despite the fact that the essential information on Wade's mental health was nowhere near complete. As a result of his failure to seek a continuance, Ames took the case to trial before he had developed any real theory of the defense, and before he had received any reports from several critical psychiatric witnesses. Given the very strong evidence that Wade either was legally insane or could not form the necessary intent to kill at the time

of the crime, and given the nature of Ames's performance throughout the proceedings, there can be little doubt that Ames's nonfeasance is "sufficient to undermine confidence in the outcome" of the guilt and sanity phases of the trial, and not just of the penalty phase. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984).

At the time of jury selection, Ames appeared to have settled at least provisionally on a diminished capacity defense. This choice was highly unstable, however, for several defense experts had neither completed their examinations of Wade nor provided Ames with their conclusions. One of the key experts, Dr. Allison, did not even hold his first interview with Wade until March 8, 1982, shortly after the trial had started. After this interview, he reported to Ames that Wade might suffer from multiple personality disorder. Two other experts, Drs. Conrad and Rath, informed Ames of similar conclusions within the next week. It was only after receiving these reports that Ames changed the plea from not guilty to not guilty by reason of insanity.

When representing a criminal defendant, and particularly a capital defendant, an attorney has a duty to investigate potentially meritorious defenses *prior to trial*. Although events occurring at the trial may alter the defense strategy, and defense counsel should continue to pursue factual investigations throughout the trial if necessary, the time to conduct legal and factual investigation regarding possible defenses is before the trial commences. It is inexcusable for a defense attorney to proceed to trial before he has completed the factual investigation necessary to settle on a theory of the defense. Without this most basic element of trial strategy, the defense attorney's voir dire, opening statement, and cross-examination of the prosecution's witnesses, as well as all the other stages of his representation, are rendered rudderless.

---

1. Because I would hold that neither Wade's conviction *nor* his sentence can stand, and would thus reverse the district court in full, I do not consider the issues raised in Part VII of Judge Canby's opinion.

No one could seriously doubt that Wade's mental health was the potentially dispositive issue in this trial. Given the facts of this case, Wade's defense clearly and evidently depended on his mental state. In similar circumstances we have held that the failure to investigate the possibility of a defense based on mental impairment constitutes ineffective assistance of counsel. *See United States v. Burrows*, 872 F.2d 915, 918 (9th Cir.1989); *Evans v. Lewis*, 855 F.2d 631, 637 (9th Cir.1988). Yet, rather than seek a continuance to await the results of his experts' investigations of Wade's mental state, Ames decided to proceed directly to trial. In so doing, he virtually assured that the information necessary for organizing Wade's defense would not be available until after the trial had begun—after it was too late to do much of anything about it.

As a result, Wade's defense was seriously impaired. At the time of jury selection, Ames did not know that the evidence would support an insanity defense based on multiple personality disorder. Thus, while he asked perfunctory questions regarding the diminished capacity defense on voir dire, he did not ask a single question about the insanity defense. Ames clearly recognized that this failure prejudiced Wade's defense; when he finally decided to pursue the insanity defense, Ames moved for a mistrial precisely on the ground that he had failed to test the jury members' reactions to this defense, and that he therefore had no indication that the jury could fairly evaluate it. As Ames testified at the evidentiary hearing below, he "made a mistake" in failing to explore the insanity defense more fully before, and, as a result, Wade was deprived of "imperative" voir dire on insanity and dissociative disorder.

Ames's failure to complete the necessary investigations until well after the start of trial impaired Wade's defense in another respect as well. When Ames finally settled on the multiple personality theory, his presentation of that theory was ill-considered and disorganized. Because Ames did not know the conclusions of the psychiatric experts until the midst of trial, he had no opportunity to consider how to present their testimony effectively.[2] As a result, Wade was forced to hope that the jury could sort out the occasionally contradictory testimony of his expert witnesses without any real assistance from Ames.

Ames's ineffective performance continued at the closing argument of the guilt phase. Even assuming that the majority is correct in concluding that the rhetorical effect of this argument was favorable to Wade (and I have serious doubts that it was, given the truly incredible extent to which Ames distanced himself from his client),[3] Ames's presentation of the facts and the law was patently deficient. Most egregiously, Ames failed to argue for a lesser degree of homicide, even though the evidence clearly would have supported it. Indeed, the testimony of one of the prosecution's own experts, Dr. Hacker, would likely have been sufficient by itself to establish that Wade did not have the specific intent to kill. Yet Ames stated in his closing argument that he *could not recall* the substance of Dr. Hacker's testimony. This is utterly indefensible, and it clearly stems at

**2.** In part, Ames's disorganized presentation is surely attributable to the trial court's refusal to delay the case more than two weeks once Ames discovered, in the middle of trial, that a multiple personality defense would be viable. However, no mid-trial continuance would have been necessary if Ames had accepted the court's offer of a continuance to complete his preparation *before* trial.

**3.** As Justice Broussard stated in his dissent in the California Supreme Court:

> If counsel's strategy was, as the majority suggest, to convert the jury by example, his argument was not a competent execution of that strategy. Counsel did not simply admit the heinous nature of the crime, briefly say he was at first skeptical of the defense, and then demonstrate how he had become convinced by overwhelming evidence of defendant's insanity. Instead, he waxed eloquently about the horrendous details of the crime, emphasized the tragic results, and repeatedly alluded to his appointed status. Far more forceful a message than counsel's conversion was his and his wife's disgust at the crime and at the distasteful task of "representing" defendant. The jury surely detected that counsel was not wholly "converted." If counsel sought acquittal by conversion, this strategy backfired.

*People v. Wade*, 44 Cal.3d 975, 244 Cal.Rptr. 905, 922, 750 P.2d 794, 811 (1988) (Broussard, J., dissenting).

least in part from Ames's failure to conduct the essential factual and legal investigation before trial.

I note that Ames's actions in this case were not an aberration. In another capital trial just a few years later, Ames "spent a total of only 40 hours preparing for both the guilt and the penalty phases of the trial," his "trial file contained no notes or legal research, and his only substantive interview with defendant took place at the courthouse on the morning of the start of trial." *People v. Mayfield,* 5 Cal.4th 142, 19 Cal.Rptr.2d 836, 871, 852 P.2d 331, 366 (1993) (Kennard, J., dissenting).[4] In the state court evidentiary hearing in *Mayfield,* a prosecutor who was attempting to defend Ames's competence described him as "the type of attorney who seeks to win his cases by inspiration, not perspiration; by oration, not preparation." *Id.* 19 Cal.Rptr.2d at 875, 852 P.2d at 370. In a capital case, inspiration and oration are seldom enough. Moreover, in this case Ames's performance was at best totally *uninspired.* His oratory reads at times as if it were prepared in the prosecutor's office rather than by an attorney whose duty it was to seek an acquittal.

Ames's failure to carry out his responsibilities in other capital cases bolsters my conclusion that he failed to do so here. *See Sanders v. Ratelle,* 21 F.3d 1446, 1460–1461 (9th Cir.1994). In this case, Ames adhered closely to the pattern described by Justice Kennard. As a result, Wade did not receive anything resembling the effective assistance of counsel.[5]

At the sanity phase, Ames simply compounded his serious guilt phase errors by failing to present *any* evidence or even to offer *any* of his oratory—inspirational or otherwise—to the jury. Even if my colleagues

are correct that Ames "was not ineffective in failing to repeat the same *evidence* that the jury already had considered and rejected at the guilt phase," Majority Opinion at 1319 (emphasis added), there can be no justification for his failure to present a closing argument. The question whether Wade was legally insane at the time of his crime was not at issue in the guilt phase. In finding Wade guilty, the jury did not reject his insanity defense; indeed, the jury could not even have considered it. Rather, the jury rejected the related but distinct defense that Wade had no capacity to form the requisite intent to commit first-degree murder. Yet Ames made *no attempt* to explain to the jury how the testimony showed that Wade satisfied the standards for legal insanity. Nor did he make any attempt to explain that Wade would be institutionalized if he were found to have been insane at the time of the crime. Given the very strong evidence of insanity in this case, I must conclude that a reasonable likelihood exists that the outcome would have been different if Ames had conducted a proper investigation, organized the defense before the trial commenced, conducted an adequate voir dire regarding the insanity issue, made an appropriate closing argument, and otherwise handled the case in a competent manner.

For the above reasons, I would hold that neither Wade's conviction nor his sentence can stand.

## II.

Although I join in the portion of Judge Canby's opinion which concludes that Ames rendered ineffective assistance at the penalty phase, I believe it necessary to respond to Judge Trott's assertion—which I assume he makes with tongue at least partly in cheek—

---

4. The majority in *Mayfield* did not disagree with Justice Kennard's conclusion that Ames had rendered deficient performance. Indeed, Justice Mosk's majority opinion noted that Ames's penalty phase efforts were "somewhat perfunctory" and that Ames "did not undertake the kind of investigation that could have led to an informed tactical decision" not to call family members as witnesses. *Id.* 19 Cal.Rptr.2d at 869 & n. 15, 852 P.2d at 365 & n. 15. The majority opinion rejected Mayfield's ineffective assistance claim solely because it concluded that Mayfield could

not show prejudice, in light of the "compelling" prosecution evidence. *Id.*

5. It inspires little confidence that the trial judge considered Ames to be one of the "top ten defense attorneys" in the county. It inspires even less confidence to know that Ames is one of only five defense attorneys authorized to represent capital defendants in San Bernardino County. *See* Opinion of Judge Trott at 5032.

that our decision rewards a "skilled professional ... with a slap in the face because he wasn't Clarence Darrow." Opinion of Judge Trott at 5053. Carried away by the excesses of his own rhetoric, Judge Trott actually likens Ames's wholly inadequate penalty phase closing argument in this case to Darrow's well-known and masterful closing argument in the case of Leopold and Loeb. It is simply ludicrous even to mention Darrow's brilliant *twelve-hour* plea, which raised every possible argument and touched on every possible emotion, in the same volume of the Federal Reports as Ames's disastrous summation of *less than ten minutes*. Ames's argument, in total contrast to Darrow's, offered the jurors one and only one justification for keeping Wade alive: so that he could be a "human guinea pig."

Few capital defendants can engage the services of a Clarence Darrow. But surely they are entitled to more than the wholly ineffective representation Wade received from S. Donald Ames. Ames went to trial before he received the key experts' reports on Wade's mental condition, and his actions at trial demonstrated a continuing inability to figure out how to deal with the issue of his client's mental state. After the jury rejected the multiple personality defense at both the guilt and the sanity phase, Ames chose to rely on that defense as the sole mitigating circumstance at the penalty phase, although the record makes clear the existence of a separate and highly significant potential mitigating circumstance—Wade's history of childhood physical and sexual abuse. Amazingly, Ames did not rely on that independent mitigating circumstance *at all* during the penalty phase. Instead, he referred to the issue of Wade's childhood history only *once*, and then only indirectly, when he asked him if he had told the truth about it to his psychiatrist. Otherwise, there was not a single mention during Ames's entire examination of Wade of the physical and sexual abuse that Wade had suffered. Nor did Ames even seek during his penalty phase closing "oration" to remind the jurors about the evidence of such abuse that had been introduced during the guilt phase. Instead, Ames relied on one mitigating circumstance exclusively—the

mental disorder that resulted in Wade's body being "inhabited" by Othello.

Unlike my colleague Judge Trott, I cannot conclude that Ames's decision to deal with the extensive evidence that Wade was abused as a child solely with a yes-or-no question was an ingenious tactic that effectively transported the guilt-phase testimony of child abuse into the penalty phase. Not only did Ames devote essentially the entire penalty-phase hearing to the presentation of evidence regarding Othello and the multiple personality issue, but his rambling closing argument failed entirely to mention the subject of Wade's childhood abuse. During that argument, Ames *did not seek to persuade the jury that Wade's history of abuse was a cause for leniency; moreover, he did not even inform the jurors that they could consider that abuse as a mitigating circumstance.* In light of these failures, the yes-or-no question to Wade regarding the truthfulness of his statements to the psychiatrist can hardly be termed a tactical stroke designed to bring all of the evidence of childhood abuse before the jury in the most salutary fashion. Even if that had been Ames's intent, he immediately rendered the "strategy" wholly nugatory by failing even to refer to the subject of physical and sexual abuse in his closing argument and by failing to advise the jury that such abuse constituted a mitigating circumstance. Thus, either way, Ames's performance was ineffective.

I find it particularly disturbing that Ames effectively abandoned a potentially powerful mitigating circumstance in favor of exclusive reliance on a theory which was rife with demonstrated pitfalls. The jury had *twice* rejected the defense on which Ames chose, intentionally or otherwise, to bet Wade's life—once at the guilt phase and once at the sanity phase. Moreover, the *manner* in which Ames chose to present evidence of the disorder at the penalty phase—by calling forth Othello—clearly involved serious risks, risks that were subsequently fully realized. Ames knew that Othello was violent, abusive, and vile. He may not have known that Othello would all but dare the jury to sentence Wade to death. However, he had to know that the members of the jury would

likely be repulsed by Othello's actions, and that, seeing Othello first-hand, the jury might well become convinced that there was no hope for rehabilitation.

As Judge Trott forcefully argues, in some circumstances the risk might well have been one worth taking. However, in this case there was no tactical or strategic reason that could justify *abandoning* a potentially powerful mitigating circumstance in favor of *exclusive* reliance on a circumstance which the jury had already, in one form or another, rejected twice before. Even if the jurors did not believe that Wade killed Joyce Tolliver while under the influence of an extreme mental disturbance, they might well have been moved by the details of the abuse *he* had suffered as a child. Wade's history of abuse was clearly a mitigating circumstance that would have weighed in the penalty deliberations, but for Ames's failure to mention it to the jury. There is no possible justification for Ames's failure to discuss the facts regarding Wade's childhood mistreatment with the jury or his failure to advise the jurors that sexual and physical abuse constitute a mitigating circumstance. An argument that the jury should consider Wade's childhood abuse as a mitigating circumstance would not have detracted at all from the argument that his multiple personality was also such a circumstance. In fact, although the two mitigating circumstances would have stood independently of each other, they would also have been quite complementary. The abuse Wade suffered at the hands of "Jack" was certainly a possible cause of his mental disorder. I can conceive of no legitimate explanation for Ames's failure to urge the jury to consider both the abuse *and* the resulting mental disorder as mitigating circumstances. Certainly, that failure cannot be explained by invoking the shibboleth of a "tactical or strategic choice."

Moreover, Ames's failure to urge Wade's childhood abuse as a mitigating circumstance is but a part of the most serious flaw in Ames's penalty-phase assistance: his closing argument. As noted above, Ames took less than ten minutes to present his closing argument at the penalty phase. He cannot be said, under any standard, to have done a competent job in the brief time he spent. At times, Ames's presentation was obtuse and incomprehensible; he appears to have been fixated, for example, on the fact that the world is round. At other times, Ames expressed empathy with the prosecution and resignation that he would not be able to persuade the jury in any event. At still others, Ames made comments that do not appear relevant to any conceivable issue in the case.

In the entire less-than-eight-page transcript of the closing argument, Ames offered only one concrete reason for the jury to spare Wade's life: "Give us an opportunity to examine a person like that, determine whether we can help others who may be like him, who may follow him, and how we can help him. A human guinea pig, if you will." Ames never argued that Wade's mental disorder reduced his culpability for the crime, and he never argued that Wade's childhood abuse constituted a partial explanation for his conduct. He merely urged the jury to keep Wade alive as a "human guinea pig." Yet Ames soon undercut even this pitiful argument against a death sentence. In the last sentence of his argument, Ames clearly averred that the death penalty might be the best result for all concerned: "As has been expressed to me by Melvin on many occasions, he can't live with that beast from within any longer and if in your wisdom the appropriate punishment is death, you may also be giving an escape once again by analogy the gift of life to Melvin Meffery Wade to be free from this horror that he and only he knows so well."

Unlike Judge Trott, I can see no justification in this case for a defense attorney telling the jury that a death sentence would give a mentally disturbed defendant "an escape" and "the gift of life." Judge Trott would have us believe that these statements were part of an argument for a lesser punishment. Indisputably, they were not. They were without question an argument *for* execution, and there can be no doubt that the jury took them that way. It is true that a particularly clever and subtle defense attorney might in a most unusual case make the type of argument that Ames made, with the hope that it

would cause the jurors to try to punish the defendant more severely by withholding the "gift" of the death sentence because they were persuaded that a life sentence was a harsher form of punishment. However, a reading of Ames's closing argument makes clear that that is not what Ames intended. Ames was not arguing that life imprisonment would be either a harsher or a sufficient punishment. He was arguing instead that the imposition of a death sentence would not be a bad decision, and might actually be good for *all* concerned: "considering the disorder, the emotional disturbance that the evidence has suggested to you by way of the physicians in this case and the psychologists, *I don't think that Melvin Wade, Melvin Meffery Wade, can actually, can be said to lose this case.*" In the context of the rest of his sometimes disoriented argument, Ames seems to have been free-associating or saying whatever came into his mind at the moment. The argument smacks of lack of preparation and organization. Ames was, as some like to put it, simply thinking out loud or talking off the top of his head. In this case he unfortunately failed to consider what effect that undisciplined exercise might have on the jury's deliberations.

By arguing that Wade could not "lose this case" even if he were executed, because an execution would provide "the gift of life" and an "escape" from the "horror that he and only he knows so well," Ames effectively relieved the jurors of the heavy responsibility inherent in imposing a sentence of death. Ames's argument told the jury that it need not be concerned about the awesome function it was performing, because an execution would in fact benefit the defendant. Thus, Ames removed the chief obstacle to most jurors' willingness to vote for a death sentence—individual conscience and the fear that an error in judgment may lead to the wrongful taking of another person's life. As a result, Ames violated the most basic duty of a defense attorney in a capital case: to seek as zealously as possible within the bounds of the law to prevent the defendant from being executed.

Despite the clear import of the closing argument, Judge Trott interprets Ames's

statements as arguing "that a life sentence without possibility of parole would be sufficient punishment given Wade's mental condition." Opinion of Judge Trott at 1347. He does so in a peculiar manner. He associates Ames's argument with a line from Shakespeare and a closing argument by Clarence Darrow. The short answer to Judge Trott's dazzling if irrelevant display of the breadth of his erudition is that neither Shakespeare nor Darrow made the closing argument in this case; S. Donald Ames did—and Ames is no Shakespeare, let alone a Clarence Darrow. Ames most certainly told the jury that an execution would be beneficial to Wade. Although Ames's actions were undoubtedly well-intentioned, they were entirely inconsistent with his obligation to seek to preserve his client's life.

With the statement as to how a death sentence would ease Wade's pain as its final flourish, the closing argument was sufficient by itself to demonstrate that Ames's performance at the penalty phase was clearly deficient. There can be no doubt that the argument was highly prejudicial. However, I see no reason to rely merely on my characterizations of the closing argument, or Judge Canby's. In the appendix to this opinion, I have reprinted the text of Ames's penalty phase closing argument. That way no one need be concerned that either Judge Canby or I have taken all or any part of it "out of context." Opinion of Judge Trott at 1344. I am certainly willing to let the appendix stand as the test of my conclusion that Ames was ineffective. I cannot believe that any reader would want an argument like Ames's to be the one on which his own life depended.

### III.

Representing an individual who is accused of a capital offense is the most demanding, complex, and weighty responsibility in the entire legal profession. Those who undertake this responsibility—usually at a considerable sacrifice—should be commended. In California, unlike so many other states, the representation of capital defendants is frequently excellent. This is due in large part to the California Appellate Project and other organizations dedicated to ensuring, training,

and providing effective counsel in death penalty cases. It is due also to dedicated counsel who are committed to preserving the constitutional principles involved in those proceedings. It is unfortunate when, in a particular case, we fall short of our goal of providing effective representation. The consequences could not be more disastrous—for the defendant or for the Constitutional principles involved. When such an event occurs, the courts must move firmly and forcefully to protect the defendant's fundamental rights. We do so here not because we wish to denigrate Mr. Ames, but because it is our obligation to enforce the Constitution. Reversing Wade's conviction would in my view accomplish that purpose fully. Reversing only his sentence accomplishes it at least in part.

## APPENDIX

### Appendix to the Concurring Opinion of Judge Reinhardt

*S. Donald Ames's Full Closing Argument at the Penalty Phase of Melvin Wade's Trial*

May it please the Court, Counsel, ladies and gentlemen of the jury.

I am not speaking for the State of California. I stand before you and speak to you on behalf of just one person. And the District Attorney has used a great deal of rhetoric in describing the conduct and the kind of person that I represent, Melvin Meffery Wade.

This cause has been lengthy. You've taken a lot of time out of your lives to contribute to and devote to what we call justice. You have participated in a lengty [sic] process, arduous task, I'm certain that all of you have felt, when weighing what has happened to one human being and what should be done to another.

We went through the penalty phase of this case and the defense that was presented to you was known in the law as diminished capacity, and for the reason that Melvin Meffery Wade was insane under the law; that is, he could not conform his conduct to the requirements of law.

All 12 of you, to the extent it was necessary to return a guilty verdict, rejected that argument, that defense.

There was overwhelming evidence that that body did it, and faced with that choice, your decision was that he was guilty of murder in the first degree and that his conduct fit the description contained in both of the special circumstances. And without consideration of the mental state of Mr. Wade, if that was not a consideration, certainly the judgment of his conduct was appropriate; that is, that person, that body, had taken the life of an innocent ten-year-old child.

Having fulfilled that phase you went on to the next phase of this case, and that was to determine whether or not Melvin Meffery Wade was not guilty by reason of insanity.

You recall I made no argument to you and we submitted no new evidence on that issue. You had heard a great deal of evidence pro can [sic] con. Insanity being a product of the law, not of medical science, once again you rejected that defense contention that Melvin Meffery Wade was insane under the law and thus would have been not guilty of the crime. You found him sane.

So now we are at the end of this long journey and you are to decide what is the appropriate punishment to be meted out to Melvin Meffery Wade.

Were I charged with the responsibility of representing the People of the State of California, my position would be approximately the same as Mr. Christy's. I don't believe that it is fun, I don't believe that it is honorable in the sense that I use the word, but a difficult job to ask a body to take the life of another human being, for whatever reason. But I probably would have assumed that same position that Mr. Christy assumed for you in this courtroom just a few moments ago. And that would be to disregard any evidence of mental or emotional disturbance, and certainly if one didn't disregard it, to label it as absurd and reject it in that fashion.

But I am not in Mr. Christy's shoes. And Melvin Wade does not have two prosecutors in this case. I have by analogy argued to you the mental condition of Melvin Meffery

Wade at the time of the commission of the crime through the punishment phase—I mean, strike that, through the penalty phase—I do mean the guilt phase, and I mean the sanity phase. By analogy I have argued to you or attempted to prove to you that the earth was round. I have summoned reputable physicians, psychologists, to sit in this chair and tell you that whatever label they put on it, whatever kind of sickness they described it to be, that Melvin Meffery Wade was a very, very sick young man. I did that both at the guilt and sanity phases. I kept arguing with you and trying to prove to you by analogy that the earth was round, that Melvin Meffery Wade did have this disturbance. And whatever your collective reasoning, you have rejected those contentions.

So now I stand before you and I have to say, well, at least the earth is oval, would you believe that. We are not now concerned with the legal test for insanity. We're talking about whether or not there is an extreme mental, emotional disturbance at the time of the commission of the crime.

Now, if you believe that Melvin Meffery Wade is capable of convincing all of the people that he talked to, the doctors that I referred to, there's no such defense available to him, there's no such balancing for you.

I apologize to you for the testimony of— and I must refer to his testimony as that of belonging to Othello Mulet Metheen, not Melvin Meffery Wade—I apologize in the sense that it's not the kind of testimony you would expect to hear from a court of law. It's not the treatment that a defendant in any kind of a criminal action should afford his Honor. It's not the kind of treatment a defendant in any kind of an action should treat a prosecuting attorney as Mr. Christy was treated by the defendant; that is, Othello in this case. And it's not the kind of treatment that any of the court personnel, bailiffs or otherwise, should be subjected to.

I didn't know what the testimony would be. And I certainly apologize to you ladies and gentlemen for the language that was employed. But I felt it necessary for you to see what I had seen over the months, what the

doctors had seen in the flesh over the months.

You in the final analysis are going to have the opportunity to reject that defense contention or embrace it to the extent that you don't kill Melvin Meffery Wade.

To all intents and purposes, that man's life is over, because the punishment that we as society will exact from him will effectively end his life, no matter what it is. If you impose life in prison without possibility of parole, you merely give Melvin Meffery Wade a license to continue to breathe, to sustain that life that beats within him, until a power greater than ours eventually will take that life. But not a real, meaningful life as we all know life to be, to love and to be loved, to enjoy oneself during our busy workdays or our recreational time. That will not be a quality of life that Melvin Meffery Wade will have if the punishment you exact is life without possibility of parole. It will be one merely of existence, waiting to die.

Of course, we all are here waiting to die. But during that process we are in pursuit of life, liberty, and happiness. That pursuit will be shut off as far as Melvin Meffery Wade is concerned.

I would say that that kind of being, normal life, if you believe that he had this kind of a disorder, certainly punishes that body to the extent that he would serve as a deterrent to those of us who are normal. To those of us who would be sick, no punishment of any kind that you could inflict would deter those kinds of people. If they are truly sick, they're going to deport themselves as their sick mind dictates, and we of society cannot control how they will act unless we put them into an institution that segregates them from the rest of us.

So I'm suggesting that Melvin Meffery Wade be given that kind of a punishment, a continued existence until death. Give us an opportunity to examine a person like that, determine whether we can help others who may be like him, who may follow him and how can we help them. A human guinea pig, if you will. We will have shunted him to the side. Society will not have to fear the likes

of Melvin Meffery Wade from this day forward if that is your punishment for him.

I don't know that I'm articulate enough or persuasive enough, and I don't think that anybody really can be as they stand before you in the short period of time and ask you to spare the life of another human being.

I was not present April 10th or 11th to attempt to persuade whatever force motivated Melvin Meffery Wade to spare the life of Joyce Toliver [*sic*]. But I can assure you that I would have argued with a great deal of passion had I been given that opportunity.

I believe the die has already been cast. I think that you as individuals without consulting each other collectively based upon your past verdicts in this case have decided what you are going to do.

When you apply the law, just remember that it's not a simple process. By that I mean you don't add up the aggravating circumstances as you see them and add up the mitigating circumstances and whichever side wins, that's who you vote for. That's not the way you apply the law.

If you only find one—for instance extreme mental emotional disturbance at commission of the crime, the mitigating side—that one, if you give it that much weight and everything else is on the aggravating side, that's enough to sustain your verdict of life in prison without possibility of parole.

As I said, this has been a lengthy trial and it has been hard on everybody. Believe it or not, Melvin Meffery Wade, through me, expresses his thanks to you for the time and the consideration that you all took in evaluating the evidence and your deliberations in this case.

And that's important. Important in the sense that based upon the facts, without anything more, the conduct of that person, there have been times and places when twelve people more or less would take a defendant out and just lynch them.

We've come a long way from that time. And for your consideration in this matter, Melvin Meffery Wade does thank you.

I just want to conclude with, considering the disorder, the emotional disturbance that the evidence has suggested to you by way of the physicians in this case and the psychologists, I don't think that Melvin Wade, Melvin Meffery Wade, can actually, can be said to lose this case.

As has been expressed to me by Melvin on many occasions, he can't live with that beast from within any longer and if in your wisdom you think the appropriate punishment is death, you may be also giving an escape once again by analogy the gift of life to Melvin Meffery Wade to be free from his horror that he and only he knows so well.

Thank you very much, ladies and gentlemen.

TROTT, Circuit Judge, concurring in part and dissenting in part:

Nay, lay thee down and roar;
For thou hast kill'd the sweetest innocent
That e'er did lift up eye.[1]

Melvin Wade killed 10-year old Joyce Tolliver. Over a 22-hour period spanning two days, Wade punched her, hit her with a board from a broken couch, locked her in a dufflebag which was placed in a crawl space in the ceiling, slammed her head into a wall with such force that her head penetrated the wall, hung her by her neck from a wall using a dog leash, stomped on her chest, and made her drink her own urine. During the abuse and torture, Wade complained that "they" had turned him from a sweet and gentle man into a madman.

Wade later claimed that an alternate personality residing inside his body called "Othello" actually tortured and killed young Joyce. We may never know what precisely drove Wade to commit these terrible acts. We do know that a jury, after hearing all the evidence, provided "the censure of this hellish villain"[2] by finding Wade, not "Othello," guilty of first-degree murder and sentencing him to death.

---

**1.** William Shakespeare, *The Tragedy of Othello, the Moor of Venice* act 5, sc. 2.

**2.** *Id.*

But the curtain on this tragedy has yet to close. Wade stands before us seeking habeas relief. The majority finds constitutional error in the penalty phase of Wade's trial; I do not. Because I find no merit in any of Wade's claims, I would affirm the district court's denial of habeas relief.

I respectfully disagree with Judge Canby's conclusion that Melvin Wade is entitled to a new special circumstances determination because the torture-murder special circumstance instruction failed to meet the requirements of the Eighth Amendment. In my judgment, the jury instructions adequately conveyed that intent was an essential element of the torture-murder special circumstance. In that regard, I agree with the California Supreme Court's determination on this issue.

I also disagree with Judge Canby's conclusion that the performance of Wade's counsel at the penalty phase was ineffective and cannot survive review under *Strickland v. Washington*, 466 U.S. 668 (1984). Contrary to Judge Canby's allegation, the record shows that Wade's counsel did introduce substantial evidence of Wade's abuse as a child prior to *and* during the penalty phase. Moreover, I do not believe that summoning "Othello" was necessarily a mistake or that it backfired. Finally, the record does not support Judge Canby's conclusion that counsel "gave up any effort to persuade the jury to impose a sentence other than death."

I

Judge Canby is certainly correct when he states that if the statutory language defining an aggravating circumstance is "too vague to provide any guidance to the sentencer," *Walton v. Arizona*, 497 U.S. 639, 654 (1990), that aggravating circumstance *may* fail to pass muster under the Eighth Amendment as interpreted by the Supreme Court in *Gregg v. Georgia*, 428 U.S. 153 (1976). The next step, however, is to determine "whether the state courts have further defined the vague terms and, if they have done so, whether those definitions are constitutionally sufficient," *i.e.*, whether they provide *some* guidance to the sentencer. *Walton*, 497 U.S. at 654. If the answer to this inquiry is "yes," then the

circumstance itself is valid, and the only remaining question is whether a defendant sentenced to death was accorded the benefit of the judicially clarified construction. *Id.* at 653; *see also Godfrey v. Georgia*, 446 U.S. 420 (1980).

The State essentially does not contest the claim that the statutory language of the torture-murder special circumstance, if read in isolation, might raise a vagueness issue under the first part of the test. The California Supreme Court evidenced such a concern in *People v. Davenport*, 710 P.2d 861, 875 (Cal. 1985), observing that the language in question might be insufficiently narrow under *Godfrey* unless it was understood to require an *intent* to torture. Relying on the established legal definition of torture under California law, however, the California Supreme Court held that the language of the special circumstance *did* include such a requirement of intent. The court said:

> [T]he torturous intent of the perpetrator is of such well-established significance that we cannot believe the legislative body in this instance intended to remove the requirement [of intent] from the special circumstance. The very use of the term torture to describe the class of murders to which the subdivision applies necessarily imports into the statute a requirement that the perpetrator have the sadistic intent to cause the victim to suffer pain in addition to the pain of death, which intent is distinct from the intent to cause the victim's death.

*Id.*

Thus, the pivotal question in this case is whether the jury *understood* that intent to torture was an essential element of the torture-murder special circumstance. Based on the record, I am convinced that the jury could not have understood otherwise. Essentially, I agree with the California Supreme Court's analysis of this issue. Joined by five of his colleagues, Chief Justice Lucas said:

> Defendant contends that, given the *Davenport* holding, the torture-murder special-circumstance finding in this case must be reversed because the special circumstance

instruction failed to inform the jury that the specific intent to torture was an element of the special circumstance. (See, e.g., *People v. Leach* (1985) 41 Cal.3d 92, 110, 221 Cal.Rptr. 826, 710 P.2d 893.) Although the special circumstance instruction, viewed in isolation, did not, by its express terms, explain that the "infliction of torture" element of the special circumstance included an intent-to-inflict-cruel-pain requirement, we believe that in light of the accompanying torture-murder instructions and the argument of counsel on this point there is no reasonable likelihood that the jury was misled on this issue.

In instructing the jury at the guilt/special circumstance phase, the court gave instructions on both torture-murder and on the torture-murder special circumstance. In defining torture-murder, the court made clear that "[a] necessary mental state in murder by torture is the specific intent to cause cruel pain and suffering...." Although in some cases there may be reason to doubt that the jury understood that the "infliction of torture" element in the torture-murder special circumstance embodies the same intent-to-cause-cruel-pain element as in torture-murder, nothing in the present record suggests the jury in this case was likely to have drawn any such distinction in the use of the term "torture" in the two instructions. Indeed, the prosecutor in closing argument specifically explained to the jury that the torture-murder special circumstance required essentially the same showing as torture-murder itself, plus the single *additional* element of an intent to kill. And neither the prosecutor nor defense counsel suggested at any point that a torture-murder special circumstance could be established without first proving an intent to torture. Under these circumstances, we are confident that the jury understood the basic elements of the torture-murder special circumstance, and that the special circumstance finding was not based on a mere accidental or unintentional infliction of cruel pain.

*People v. Wade,* 750 P.2d 794, 805 (Cal.) (footnotes omitted), *cert. denied,* 488 U.S. 900 (1988).

I do not believe it at all likely—indeed it is most unlikely—that a rational jury could believe it had to find intent to torture for first-degree murder, but that somehow the intent element dropped out when the issue escalated into whether a special circumstance warranting the death penalty existed. This assessment seems especially true given the ordinary meaning of the word "torture" which unmistakably embodies the idea that the act is done with intent. The dictionary defines torture as "the infliction of intense pain ... to punish or coerce someone: torment or agony induced to penalize religious or political dissent or nonconformity, to extort a confession or a money contribution, or to give a sadistic pleasure to the torturer." *Webster's Third New International Dictionary* 2414 (1976). All the verbs in this definition are inconsistent with the idea that torture could be either accidental or unintentional.

## II

Judge Canby concludes also that Wade's counsel's performance at the penalty phase fell below the *Strickland* standard of effective representation. I do not. Judge Canby relies on three alleged tactical defects by Wade's counsel: (1) failing to present at the penalty phase "*any* significant evidence" of Wade's abuse as a child; (2) calling Wade to the stand and summoning Othello whose "testimony can only have been damaging to Wade"; (3) allegedly arguing to the jury that "executing Wade would be an outcome favorable to Wade." I will address each in turn.

## A

First, Wade's attorney *did* present mitigating child abuse evidence during the penalty phase. He called Wade to the witness stand and asked him if the extensive evidence of child abuse admitted during the guilt/special circumstances phase was true:

Q Melvin, you've told the doctors about your childhood when a person by the name of Jack abused you sexually and physically. *Was that true?*

A *Yes, it was true.*

Q You didn't make it up?

A No.

RT at 6307 (emphasis added).[3] In my view, this transported into the penalty phase as "true" the lengthy testimony of child abuse offered during the guilt phase by way of the testimony of doctors and a videotaped interview of Wade conducted by his psychiatrist, Dr. Allison, and his attorney.

Judge Canby's conclusion on this issue is startling. The only restriction placed on the detailed child abuse testimony at the guilt phase was that it would not be considered *for its truth.* By asking Wade at the penalty phase whether the child abuse testimony was *true,* and by soliciting Wade's answer that *it was true,* Wade's counsel severed this restriction. Thus, the restriction on the jury's use of the testimony at the guilt phase was erased and is immaterial. This conclusion is particularly inescapable in view of the trial judge's penalty phase instruction on the use of evidence: "In determining which penalty is to be imposed on the defendant, you shall consider *all the evidence* which has been received during *any part* of the trial of this case." *Id.* at 6449–50 (emphasis added).

It makes sense not to go through the same testimony twice for the same jurors. It would elevate form over substance to require Wade to repeat in the penalty phase everything the jury had already heard earlier, including Wade's videotaped testimony on the subject. Dr. Rath's testimony on this issue was particularly lengthy and detailed. Here from the evidentiary hearing in district court is counsel's explanation of his tactics, an explanation that I cannot conclude is unprofessional:

> Q At that time [prior to actual start of the trial] were you also considering what to present at the penalty phase?
>
> A Yes. . . .
>
> *I agonized over the presentation of evidence in this case from the very beginning to the very end as to what I could do as an attorney to save my own boy's life.* It was on the line, and I knew it, and I agonized over it every second of it, whether I was in the courtroom or out of the courtroom.

. . . .

Q Was it your desire to present psychiatric testimony at the penalty phase?

A Well, I recall I didn't, for this reason: That we had presented all of the psychiatric and psychological testimony in [the] guilt phase.

Now as a Monday Morning Quarterback, you might say, well, he [shouldn't] have done that, and you should have held back some expert, or whatever, to go to the penalty phase.

But the jury heard it in whatever phase you want to describe. The jury heard this evidence from the experts as to Melvin Wade's mental illness. And then they heard again from Dr. Olliver, and Dr. Haggar who were on the Medical Commission appointed by the Court.

Q And with regard to what was presented to the jury in terms of his mental illness, had the—at the guilt phase, isn't it correct that you presented those historical facts as they bore upon his multiple personality affliction, if you will?

A I believe I did that.

Q And did you consider in the presentation of the multiple personality defense at the guilt phase, whether it would be advisable [to retain] one of these experts for an alternative mitigation presentation at the penalty phase?

A I considered it, but I just wanted the jury to know in a case like this with such hideous facts, I wanted the jury to know very, very early that what the motivation was behind Melvin Wade, and I didn't want to wait for one phase after another phase after another phase; I wanted that jury to know what Melvin Wade was like immediately, could go into history to put his case on.

It was my view that the jury, if they could, would have lynched Melvin Wade and me right on the spot, and I wanted to mitigate that feeling, those high feelings

---

**3.** "RT" refers to the reporter's transcript of the state trial. "EH" refers to the evidentiary hear- ing in federal district court.

that were running rampant in San Bernardino County.

I'd walk out in the street and people would, if they knew I was his lawyer, they'd hate me for no other reason. I wanted them to know that Melvin Wade was a human being, that he was a sick human being, and I didn't want to wait until the end of the case to present that, so that the jury would cement and harden their position very early as they heard Mr. Christie put on all of the evidence in this case.

. . . .

Q Did you consider presenting evidence of Mr. Wade's abused childhood as mitigation of the penalty?

A No, *because it was already before the jury.*

Q Why, in order to put it before the jury, did you consult with an expert to see how that material might, apart from its role in his multiple personality defense, how that would—might affect his conduct towards his—so as to constitute mitigation of the penalty?

A If I understand your question: Did I present that child abuse as a separate and distinct defense apart from the relationship it had to dissociative disorder?

The answer to that question is, I did not, because I felt that was before the jury, and it was—had been embraced in the relationship to the dissociative disorder multiple personality type, based upon all the information I had, based upon prior defendant with that same child abuse which then gives rise to a multiple personality.

I knew all of these things, and *I presented them to the jury within the concept of the dissociative disorder, not as a separate defense apart from that.*

5/22/90 EH at 124–26, 128–29, 138–39 (emphasis added).

Judge Canby fails to appreciate how the testimony from one phase in a capital case in California is incorporated into each following phase. Section 190.4 of the California Penal Code controls and explains how this works:

(c) If the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty was a jury, the same jury shall consider any plea of not guilty by reason of insanity pursuant to Section 1026, the truth of any special circumstances which may be alleged, and the penalty to be applied unless for good cause shown the court discharges that jury in which case a new jury shall be drawn. . . .

(d) In any case in which the defendant may be subject to the death penalty, evidence presented at any prior phase of the trial, including any proceeding under a plea of not guilty by reason of insanity pursuant to Section 1026 shall be considered at any subsequent phase of the trial, if the trier of fact of the prior phase is the same trier of fact at the subsequent phase.

To designate Wade's testimony at the penalty phase on this issue as "brief" betrays a misunderstanding of this process.

It is clear from the record that Wade's counsel devised a skillful method of presenting the predicate for Wade's dissociative disorder defense to the jury during the guilt phase without subjecting either Wade or his mother and sister to cross-examination. This can hardly be said to constitute ineffective representation. In fact, it was quite intelligent. A tactic that enables a defense attorney to present a favorable mental state defense to a jury through the testimony of expert witnesses and that permits the defendant to be seen and heard by the jury on this issue without being cross-examined is highly skillful and professional. This tactic is the mark of experience and know-how, not incompetence, and it supports the state court trial judge's views given in the evidentiary hearing that Wade's counsel at the time of the trial was one of the "top ten defense attorneys" in the county, and one of only five allowed to handle capital cases. 5/23/90 EH at 114. The trial judge testified also that his opinion of counsel's ability actually "went up" as a result of counsel's performance in Wade's case. *Id.* at 115. Here is what Judge Kayashima had to say about counsel's use of videotaped testimony: "I thought it was very clever, clever in the sense that he was able to put on his case, his defense

without subjecting his client to cross-examination in the guilt phase." *Id.* at 117.[4]

The record shows without doubt that the possible sources of corroboration of the child abuse testimony—Wade's mother and sister—could have well been more favorable to the prosecution than to the defense. Wade's counsel describes Wade's mother as either denying the allegations of child abuse, avoiding responsibility, or protecting the abuser "Jack". 5/22/90 EH at 132–33. In fact, counsel's recollection was that Wade's mother "was supporting Jack, her boyfriend." *Id.* at 133.

Wade's sister, who was in federal prison when she signed a declaration for this case in 1991, was no better, and could well have been used by the prosecutor to impeach Wade's allegations of multiple personalities. Her declaration contains corroborating evidence of Wade's child abuse, but no hint of "Othello."

As I read the record, these are obvious reasons why any experienced trial attorney might decide not to call Wade's mother or sister to the stand, and why instead he would choose to rely on Wade's and his doctors' testimony. Calling mothers and sisters to the stand under these circumstances can quickly backfire as the mother/sister of the person abused covers herself and creates distance from blame. Moreover, a standard prosecutor's tactic on cross-examination of a family witness is to seize on the opportunity to build the prosecutor's case in a way that cannot be done effectively by calling such a hostile witness as part of the State's case, especially where a mental defense is involved. "Favorable" family witnesses are universally regarded by prosecutors as "sitting ducks" on cross-examination.

It is axiomatic among trial lawyers that "less can be more." We do not know what would have happened if Wade's mother and sister had been called to the stand, but based on what we do know, I agree with Judge Canby that counsel's decision not to call them as witnesses was not *Strickland* error.

4. From a cold record, it is a challenge to assess the performance of a trial attorney. Because Judge Kayashima was there, and Judge Rein-

## B

Using the power of hindsight, Judge Canby finds fault with counsel's attempt (by asking "Othello" to testify) to demonstrate to the jury the dissociative disorder on which he was relying to save Wade's life. I disagree. Of course "Othello" was profane and insulting and wild, but this is exactly what counsel had to demonstrate in order to prove the existence of a mitigating circumstance at the penalty phase, *i.e.*, the existence of a mental disorder that would justify life instead of death. The evidence of a mental disorder might not have worked at the guilt or the sanity phases, but it assumes a much different role at the penalty phase. Prior to that phase, Wade's mental disorder was relevant to attack the mental state required for guilt. Later, it became relevant to the issue of insanity which if proved would relieve Wade of responsibility. But at the penalty phase, the *substance* of the defense for the first time became relevant to a new issue: the penalty to be chosen by the jury. Section 190.3 of the California Penal Code demonstrates how this works:

> If the defendant has been found guilty of murder in the first degree, and a special circumstance has been charged and found to be true, ... the trier of fact shall determine whether the penalty shall be death or confinement in state prison for a term of life without possibility of parole....

> In determining the penalty, the trier of fact shall take into account any of the following factors if relevant:

> ....

> (d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

> ....

> (h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired as a result of

hardt was not, it does not surprise me that they have different opinions of counsel's performance.

mental disease or defect, or the effects of intoxication.

. . . .

After having heard and received all of the evidence, and after having heard and considered the arguments of counsel, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances.

The record conclusively establishes that counsel was properly oriented and knew exactly what he was doing during the penalty phase. After "Othello" testified, Wade's counsel argued: "We are not now concerned with the legal test for insanity. We're talking about whether or not there is an extreme mental, emotional disturbance at the time of the commission of the crime." RT at 6467. He then explained that he summoned Wade's perverse personality so the jury could see "what I had seen over the months, what the doctors had seen in the flesh over the months." *Id.* at 6468. Counsel then told the jurors that the credibility of the mitigating evidence, which was under continuing attack by the prosecution, was theirs to determine "to the extent that you don't kill Melvin Meffery Wade." *Id.* at 6468–69.[5]

Mitigating evidence is relevant for another purpose. Section 190.4(e) of the California Penal Code requires a judge in a case in which a jury has returned a verdict imposing the death penalty to "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and . . . make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented."

With this context in mind, I conclude it is *impossible* to find fault with counsel's decision to prove Wade's mental disorder by demonstrating the disorder to the jury and the trial judge and letting them see it first-hand. This is particularly true in view of the prosecutor's relentless claim that the mental disorder was a fabrication, and of the special relevance of the disorder as a mitigating circumstance. Wade's mental disorder was the most promising circumstance to save his life. His attorney believed in it and so did his doctors. Judge Canby, who was not in the courtroom, can only see the testimony of "Othello" as insulting. Counsel saw it for what it was: the best way to save his client. It is nothing short of amazing that Judge Canby finds fault with counsel's direct proof of a recognized mitigating circumstance in the penalty phase of a death penalty case. In fact, the worse the disorder, the more weight it possibly could have as a mitigating circumstance. What was counsel supposed to do? Ask "Othello" to be polite? Ask Wade to tone it down? Wave a wand at the homicidal disorder and make it less profane and more palatable to the jury?

Judge Canby seems surprised that counsel asked "Othello" if he killed Joyce Tolliver, overlooking the fact that the jury had already convicted Wade and found the existence of special circumstances. Thus, Judge Canby unnecessarily expresses concern about testimony that hardly came as a surprise to the jury.

Presenting evidence of a dissociative disorder is a difficult challenge for a trial lawyer, especially when the prosecutor labels it a farce. Must you limit yourself to the techni-

---

5. Counsel's explanation to the jury of "Othello's" testimony was as follows:

I apologize to you for the testimony of—and I must refer to his testimony as that of belonging to Othello Mulet Metheen, not Melvin Meffery Wade—I apologize in the sense that it's not the kind of testimony you would expect to hear from a court of law. It's not the treatment that a defendant in any kind of a criminal action should afford his Honor. It's not the kind of treatment a defendant in any kind of an action should treat a prosecuting attorney as

Mr. Christy was treated by the defendant; that is, Othello in this case. And it's not the kind of treatment that any of the court personnel, bailiffs or otherwise, should be subjected to.

I didn't know what the testimony would be. And I certainly apologize to you ladies and gentlemen for the language that was employed. But I felt it necessary for you to see what I had seen over the months, what the doctors had seen in the flesh over the months. *Id.* at 6468.

cal testimony of doctors? Or, can you do what all trial lawyers try to do when a jury is present, make it real, make it live, give it emotional impact. Wade's counsel wrestled with this problem and discussed it in the guilt phase with the jurors he was trying to convince:

> The problem here is the nature of the disorder, the nature of the mental disease. If Melvin Wade or any defendant in a criminal case sat before you and was obviously deranged, where we didn't need to call on qualified, reputable physicians or psychologists to make that determination for us, if you could just look at him and say he's crazy as a bed bug, the defense would not, in my opinion at least, would not offend you. The fact is you'd say to yourself it was a senseless crime, the killing of this ten-year-old girl. It made no sense. No matter how the District Attorney wants to make some sense of it, it makes no sense whatsoever. No matter how he twists and turns it, it makes sense to an insane person only.
>
> And if he had exhibited that kind of a derangement in front of you for all of us to see, with all of the classic symptoms, I don't believe that the defense of insanity would offend you....
>
> . . . .
>
> So then what do you do? How, how do you get the image of that dissociative disease before a jury who has to make the ultimate determination of whether it is in fact true or not?

RT at 6188, 6195. Operating from his judgment that his best opportunity to save his client's life would come in the penalty phase, counsel waited to call Wade until it was literally do or die.

Judge Canby admits that Wade's mental disorder was Wade's best defense: "The facts of the case lend more support to the position that Wade did not form the requisite intent because he suffered from multiple personality disorder." How Judge Canby can say this and then use hindsight to criticize counsel for attempting to prove his defense by way of prima facie evidence, good and sufficient on its face, is most extraordinary and wrong.

Judge Canby's analysis and his conclusion in this respect suggest he has failed to heed important aspects of the *Strickland* test. In particular, his approach seems manifestly at odds with these admonitions from the Court:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland*, 466 U.S. at 689 (citation omitted) (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

Judge Canby's opinion is pregnant with irony: the law permits mental diseases and disorders to be used in court to mitigate conduct and to moderate sentences, but if a lawyer proves the disease or disorder too directly by putting his client on the stand to demonstrate it to the jury, we brand the lawyer as incompetent and the tactic as unprofessional. From my vantage point, it would probably be reversible error of constitutional dimension for a trial judge to deny counsel the requested opportunity to summon "Othello" for the jury to see and to hear, especially when the prosecutor is claiming the mitigating circumstance is a phony. Judge Canby's claim that because "Othello's" testimony was "repellent," Wade was left with "no mitigating evidence at all" is no less than an unqualified repudiation of California's legislative determination that mental

disorder can be a mitigating circumstance. California's statute does not distinguish between benign and malignant disorders. In fact, the law requires that the disorder be "extreme."

Yes, the evidence of Wade's mental disorder did not prevail. This ultimate failure, however, does not render incompetent counsel's decision to use it. Trial lawyers don't get to pick their evidence or their defenses from a free-standing menu. The facts are what they are, the defendant is who he is, and lawyers have an ethical responsibility not to fabricate a defense.

### C

I come finally to Judge Canby's claim that Wade's counsel "gave up any effort to persuade the jury to impose a sentence other than death" and argued that "executing Wade would be an outcome favorable to Wade." This claim is wrong. It completely misreads and thoroughly misrepresents counsel's argument. The selective snippet of counsel's argument quoted by Judge Canby is taken out of context, and it does not do justice to the *theme* of counsel's penalty phase argument—that Wade was a victim of a horror beyond his own control and was inhabited by an uncontrollable beast within created by terrible abuse he had suffered as a child.

Counsel solidly established this theme in his argument to the jury during the guilt phase.

The reason insanity is important at this phase of the trial is because if the defendant in a criminal case cannot, because of a mental disease or mental defect, cannot conform his conduct to the standards of law because of that mental disease or mental defect, he is not guilty by reason of insanity. That's true.

But more important, he doesn't have the capacity to form the necessary intent, the mental state, before a conviction can be obtained by the District Attorney.

There must be a concurrence of act and specific intent for these crimes. Even the crime of murder by torture, a specific intent is required.

And that specific intent is to inflict the pain.

. . . .

Before I talk about the specific defense in this case, the District Attorney has accused the defense of a theatrical defense. Says it's showy. He says it's sensational. And he says it's no defense to this crime.

I disagree with him on all of those statements.

. . . .

I think you would agree with me that if Melvin Wade suffers from a dissociative disorder of the kind that has been described to you, and I think you would agree with the doctors, if he so suffers from that, he is in fact insane as defined by the American Law Institute.

Well, who has he convinced that he is insane? This very clever, this very intellectual, this very intelligent, this genius who has been seated to my right at the counsel table throughout this entire trial. Who has he convinced besides asking the question of you 12 people? Well, he convinced Dr. Chapman with 40 years of psychiatry, college education, medical doctor. He convinced Dr. Rath, a bright young psychologist. He convinced Dr. Summerour, not to the degree that he convinced others. You recall Dr. Summerour said that he believes that he had a multiple personality but it was not with a high degree of certainty was his opinion.

He convinced Dr. Allison, not that he had a multiple personality, but that he suffered from a dissociative disorder. All of the doctors who this genius has convinced all agree that he suffers from a dissociative disorder, whatever label you put on it, whether you put on it possession syndrome, the possession syndrome, or multiple personality. *And it's not "the devil made me do it," as Mr. Christy says. If he wants to talk about it, it's the devil did it, not the devil made me do it. That's what the defense is. It's the demon did it, because the demon didn't make Melvin Wade do anything, because he was not there. He was unconscious at the time.*

Who else did he convince? His lawyer. One who had seen almost every defense in the book, who has represented all kinds of people, all sizes, all colors, and all ages.

. . . .

And you know, you wonder did we have a healthy person before all this came about? April 10th and 11th of last year. Notwithstanding the psychologists or psychiatrists he saw with respect to the Workmen's Compensation claim, what about all the psychiatrists that were seen prior to that time even though there was no mention of a dissociative disorder. Is it normal for a young boy twelve, thirteen, fourteen, fifteen years old, is it normal to have three different suicide attempts?

Even if you assume it was Melvin Wade who was the person who was trying to kill himself as opposed to some other personality within that body.

All of the psychiatrists, the trips to Martin Luther King. He was sick then and he's sick now.

The defense frightens the District Attorney's Office. Probably frightens all of us when you think of what can happen to a person who suffers from that kind of a mental disease if in fact that be so.

I don't believe that we can be concerned or should be concerned with extracting our pound of flesh, quart of blood from Melvin Meffery Wade without very careful deliberation with respect to the mental state that he was under on April 10th and 11th. To do anything less would show the irresponsibility that that body showed to Joyce Tol[l]iver on April 10th and 11th.

RT at 6182, 6190–91, 6196–97 (emphasis added).

With this argument in mind, with Wade claiming no memory of the events surrounding the killing, and considering all the evidence including *three suicide attempts* by Wade, counsel's argument takes on a different meaning than the meaning attributed to it by Judge Canby. Counsel *never* argued that executing Wade would be a favorable outcome. Counsel was resolutely pursuing his "the demon did it" theme, and the idea that Wade deserved sympathy and compassion, not death.

To demonstrate counsel's effort to convince the jury to spare the life of a man who tortured a child to death, I need only array counsel's own words:

To all intents and purposes, that man's life is over, because the punishment that we as society will exact from him will effectively end his life, no matter what it is. If you impose life in prison without possibility of parole, you merely give Melvin Meffery Wade a license to continue to breathe, to sustain that life that beats within him, until a power greater than ours eventually will take that life. But not a real, meaningful life as we all know life to be, to love and to be loved, to enjoy oneself during our busy workdays or our recreational time. That will not be a quality of life that Melvin Meffery Wade will have if the punishment you exact is life without possibility of parole. It will be one merely of existence, waiting to die.

Of course, we all are here waiting to die. But during that process we are in pursuit of life, liberty, and happiness. That pursuit will be shut off as far as Melvin Meffery Wade is concerned.

I would say that that kind of being, normal life, if you believe that he had this kind of a disorder, certainly punishes that body to the extent that he would serve as a deterrent to those of us who are normal. To those of us who would be sick, no punishment of any kind that you could inflict would deter those kinds of people. If they are truly sick, they're going to deport themselves as their sick mind dictates, and we of society cannot control how they will act unless we put them into an institution that segregates them from the rest of us.

So I'm suggesting that Melvin Meffery Wade be given that kind of a punishment, a continued existence until death. Give us an opportunity to examine a person like that, determine whether we can help others who may be like him, who may follow him and how can we help them. A human guinea pig, if you will. We will have shunted him to the side. Society will not have to fear the likes of Melvin Meffery

Wade from this day forward if that is your punishment for him.

I don't know that I'm articulate enough or persuasive enough, and I don't think that anybody really can be as they stand before you in the short period of time and ask you to spare the life of another human being.

I was not present April 10th or 11th to attempt to persuade whatever force motivated Melvin Meffery Wade to spare the life of Joyce Tol[l]iver. But I can assure you that I would have argued with a great deal of passion had I been given that opportunity.

I believe the die has already been cast. I think that you as individuals without consulting each other collectively based upon your past verdicts in this case have decided what you are going to do.

When you apply the law, just remember that it's not a simple process. By that I mean you don't add up the aggravating circumstances as you see them and add up the mitigating circumstances and whichever side wins, that's who you vote for. That's not the way you apply the law.

If you only find one—for instance extreme mental emotional' disturbance at commission of the crime, the mitigating side—that one, if you give it that much weight and everything else is on the aggravating side, that's enough to sustain your verdict of life in prison without possibility of parole.

As I said, this has been a lengthy trial and it has been hard on everybody. Believe it or not, Melvin Meffery Wade, through me, expresses his thanks to you for the time and the consideration that you all took in evaluating the evidence and your deliberations in this case.

And that's important. Important in the sense that based upon the facts, without anything more, the conduct of that person, there have been times and places when twelve people or more or less would take a defendant out and just lynch them.

We've come a long way from that time. And for your consideration in this matter, Melvin Meffery Wade does thank you.

I just want to conclude with, considering the disorder, the emotional disturbance that the evidence has suggested to you by way of the physicians in this case and the psychologists, I don't think that Melvin Wade, Melvin Meffery Wade, can actually, can be said to lose this case.

As has been expressed to me by Melvin on many occasions, he can't live with that beast from within any longer and if in your wisdom you think the appropriate punishment is death, you may be also giving an escape once again by analogy the gift of life to Melvin Meffery Wade to be free from his horror that he and only he knows so well.

Thank you very much, ladies and gentlemen.

*Id.* at 6469–72.

Judge Canby's claim that "there is simply no tactical reason to argue to the jury that executing Wade would be an outcome favorable to Wade" is wrong on the two counts. Not only did counsel not say that executing Wade would be a favorable outcome, but counsel did have a good reason to say what he did, as recognized by Chief Justice Lucas in his opinion for the California Supreme Court in *People v. Wade:* "[W]e believe counsel's argument was a reasonable and tactical one, aimed at gaining the jury's sympathy for defendant, and was not tantamount to advocating his client's death." 750 P.2d at 807. Counsel was not advocating the execution of Wade. He was trying to convince the jury that a life sentence without possibility of parole would be sufficient punishment given Wade's mental condition.[6] To suggest that counsel essentially abandoned the life of his client to the death penalty is a claim that finds no support in the record.

I suppose Judge Canby would also find fault with Clarence Darrow's defense in the Leopold and Loeb case. Nathan Leopold, Jr. and Richard Loeb were wealthy, young men who, "for the sake of a thrill," sought to

---

**6.** Shakespeare expresses a similar sentiment when Othello, after killing Desdemona in a jealous rage, says to Iago, "I'd have thee live; For in my sense, 'tis happiness to die." Shakespeare, *supra,* act 5, sc. 2.

commit the "perfect crime." *See Attorney for the Damned* 16–19 (Arthur Weinberg ed., 1957). They kidnapped and later murdered a fourteen-year-old boy. In the face of enormous public outcry against the defendants, Clarence Darrow took their case. Leopold and Loeb pled guilty to the murder, but the prosecutor still demanded the death penalty. During the course of his eloquent and impassioned plea before the judge, Darrow said:

> I do not know how much salvage there is in these two boys. I hate to say it in their presence, but what is there to look forward to? I do not know but that Your Honor would be merciful if you tied a rope around their necks and let them die; merciful to them, but not merciful to civilization, and not merciful to those who would be left behind.

*Id.* at 84. When Darrow finished his argument, tears streamed down the judge's face, and Leopold and Loeb received life imprisonment, not death.

No one would claim Clarence Darrow argued that the execution of Leopold and Loeb would be a favorable outcome. Darrow was obviously pleading for sympathy, and his statement must be understood in the context of his more-than-twelve-hour plea. But Judge Canby does not give Wade's counsel any such license. Judge Canby isolates a passage out of context, then obscures its clear meaning. While Wade's counsel may

not have been Clarence Darrow, his performance was not constitutionally infirm.[7]

**D**

Looking at the record as a whole, I am convinced that Wade's destiny was to be convicted and sentenced to death as soon as the police arrived on the scene of his stepdaughter's brutal murder and Wade (not "Othello") said to them with his hands in the air, "Here I am. I'm the one you want. I guess I hit her too hard. I guess I hit her too hard."

Wade's counsel took over Wade's defense after the preliminary hearing when Wade's first attorney bailed out. Wade's first attorney told his new counsel that "the case was an absolute loser, and the facts were heinous, and ... he couldn't imagine any jury that wouldn't convict him." 5/22/90 EH at 35. Nevertheless, Wade's new counsel hired a battery of experienced investigators and had Wade examined by numerous experienced doctors, *none* of whom could find evidence of a mental defense before Wade's trial. With this in mind and after reviewing the record, I conclude that saving Wade from the death penalty would have been a feat that would have quickly found its way into the annals of incredible courtroom victories for the defense. Wade's counsel did the best he could with the little he had.[8] In legal terms, noth-

---

7. Judge Canby and Judge Reinhardt also take umbrage at counsel's argument that Wade should be studied, not executed, *i.e.*, the "human guinea pig" argument. This argument is commonly made in death penalty cases in California. Counsel frequently argue that a defendant should be kept alive so he can be studied. The purpose of such study, as the plea goes, is to enable behavioral experts to learn something useful about *preventing or curing mental disorders.* Counsel's use of this argument is not a sign that he was insensitive towards his client.

8. Judge Canby and Judge Reinhardt create the false impression that counsel was neither diligent in his preparation nor loyal to his client. They ignore counsel's unrebutted description of his reaction to discovering the possibility of a dissociative-disorder defense, a discovery made after the jury was selected:

> At that time, sir, when I became convinced that a dissociative disorder was in this case, was viable and an honest defense, it was then

that I went to the Court and said, if you like, Your Honor, for whatever reason, I made a mistake, if you like that, and that I told the Court that I believe it would be ineffective representation of Melvin not to get the benefit of exploring this defense with forensic psychologists and psychiatrists who could, once they examined him on that issue, could go to the jury and testify in that regard.

> The other reason for my request for mistrial was because I had not voir dired on the subject of insanity or dissociative disorder. And I knew that now it would be imperative that I voir dire on those areas.

> And that's the reason that I then went to the Court, moving then for a mistrial.

> The People objected. We—I don't know if it's all on the record or not, but I did not want to continue the case.

> But when the judge ordered me to continue and gave me two weeks, I wasn't going to abandon my client. I—when the judge told me that I had to go forward, I did the best I could in the period of time that the Court gave me.

ing Wade's counsel did or did not do prejudiced Wade's case: it was open and shut from the click of the handcuffs. The result of this trial was both just and reliable as required by *Strickland*. Even if counsel had chosen the tactics Judge Canby prefers, I am convinced, based on the record, that the outcome would not have changed.

### III

As soon as a person is sentenced to death, no effort is spared on his behalf to reverse his fate. Every possible motion, appeal, and petition is pursued many times over; every conceivable argument is made; and everything within legal reach is attacked with relentless fervor. All of this is well and good. It is the adversary system as it must work, and we judges should be able to sort the wheat from the chaff. This is our job.

But there is a particular aspect of this energy that should concern everyone charged with ensuring an adequate defense for those facing capital punishment. The worrisome aspect is this: trial counsel for convicted capital defendants find themselves automatically on the list of those who will be assailed for alleged deficiencies whether they deserve it or not. I do not suggest that lawyers should protect each other from *Strickland* claims. Hardly. And I do not suggest that trial counsel never fall below the *Strickland* standard. But I do believe we should examine ineffective assistance claims with great care and professional understanding. We must ensure not only that the rights of a defendant have been vindicated, but also that the lawyers who accept these sometimes thankless tasks are not rewarded with abuse. If we carelessly accept such claims when they are not grounded in the record and the standards of the profession, if we unnecessarily rake a lawyer over the coals in a superfluous concurring opinion, we may only succeed in making it unduly difficult to recruit adequate numbers of competent lawyers for the daunting task of representing the unwept. Regrettably, there is little public honor in representing child killers and others facing the death penalty. Justice O'Connor was keenly aware of this problem when she cautioned in *Strickland* against second-guessing after a conviction or an adverse sentence:

> The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair

---

I could have walked away and said, "Well, I—I'm not goi[ng] to lay my reputation or my—any part of me on the line here because you are not giving me enough time." That would have been abandoning my client, and I didn't do that. I worked day and night, all—almost to midnight, one o'clock, two o'clock in the morning in that two-week period going out to the jail, talking to Melvin Wade with Dr. Rath.

It was a nightly occurrence that we were out there after whatever we had done in court, and we would meet and—and we'd stay at the jail until they kicked us out. And then we'd go over to a—to a place called Coffee Dan's restaurant that was a—that stayed open late at night. And we would discuss the case, Rath and I—Dr. Rath and I.

Is Melvin lying to us? Is this legitimate? We were trying to do all kinds of—lay all kinds of traps for him, to determine whether he was putting us on, or this was a valid defense.

We concluded that it was not—he was not putting us on, that it was a valid defense.

So, if I went to the jury too soon, so be it. I would have liked to have gone to the jury later and discussed this with the jury in voir dire. And that's what I indicated to the trial judge, and he refused that, sir.

Q So that, you feel like even though you had consented to the trial setting, that perhaps you had begun the mistake that you indicated a moment ago, that you had begun the jury selection too soon?

A I [became] aware of that after the fact, after I had received the reports, oral or written, and mostly oral from my forensic experts. It was then that I realized I didn't have any of this information, and the—as I reflect on it, it doesn't appear to me that there was any way for me to get the information except that it broke as it did break.

5/22/90 EH at 121–23.

the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.

466 U.S. at 690.

We have done a disservice to an attorney who accepted a distasteful case after another attorney had retreated for cover. The difficulty of defending this case was compounded by his client's inability to remember any of the facts surrounding the killing. Instead of being baffled by this problem, counsel skillfully converted it into a defense of unconsciousness caused by a dissociative disorder which he presented vigorously to the jury. The evidence of this defense served a different purpose at each stage of the proceedings. In the guilt phase, its purpose was to disprove the intent required for the crime charged. In the sanity phase, its purpose was to relieve Wade from legal responsibility for his acts; and in the penalty phase, its purpose was to create a mitigating circumstance that might save his life. Using the *Strickland* standard, which tells us that "strategic choices made after thorough investigation of law and facts relevant to plausible options are *virtually unchallengeable,*" *id.* (emphasis added), I cannot identify any serious error in counsel's approach to this case. Judge Canby's analysis violates this rule.

Wade's counsel represented his client with dedication, energy, and competence. Before he entered private practice, he served his county as a public defender for six years. We serve no principal or appropriate purpose in claiming without adequate grounds that his work was constitutionally deficient. We only add a new character to this tragic tale. At the evidentiary hearing in federal court, Wade's counsel said:

> I agonized over the presentation of evidence in this case from the very beginning to the very end and as to what I could do as an attorney to save my own boy's life.... I agonized over it every second of it, whether I was in the courtroom or out of the courtroom.

5/22/90 EH at 129. A skilled professional did what he could with this impossible case. Today, we reward him with a slap in the face because he wasn't Clarence Darrow.